UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 24-cv-20135-RS

**ROSEMARIE ESTEVEZ**,

Plaintiff,

vs.

**CLERK OF COURTS AND COMPTROLLER
MIAMI-DADE COUNTY, FLORIDA,**

**JUAN FERNANDEZ-BARQUIN, in his official
capacity as CLERK OF COURTS AND
COMPTROLLER MIAMI-DADE COUNTY,
FLORIDA, and as Clerk for the Value
Adjustment Board of Miami-Dade County,
RISA RUVIN, as Personal Representative of
the Estate of HARVEY RUVIN,
ROBERT D. ALFARO, individually
and in his capacity as the MIAMI-DADE COUNTY
CLERK OF COURTS' VALUE ADJUSTMENT
BOARD MANAGER,
MARK MARTINEZ, individually,
and in his capacity as MIAMI-DADE COUNTY
CLERK OF COURTS SENIOR DEPUTY CLERK,
HOBART M. HENDERSON, individually,
and in his capacity as MIAMI-DADE CLERK
OF COURTS CHIEF OF STAFF,**

Defendants.

_____/

<u>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

COMES NOW, Plaintiff, ROSEMARIE ESTEVEZ, and sues Defendants, CLERK OF

COURTS AND COMPTROLLER MIAMI-DADE COUNTY, FLORIDA; JUAN FERNANDEZ-

BARQUIN, in his official capacity as CLERK OF COURTS' AND COMPTROLLER MIAMI-

DADE COUNTY, FLORIDA, and Clerk for the Value Adjustment Board of Miami-Dade

County; RISA RUVIN, as Personal Representative of the Estate of HARVEY RUVIN,

-1-

ROBERT D. ALFARO, MARK MARTINEZ, and HOBART M. HENDERSON, for damages and alleges as follows:

## INTRODUCTION

1.      Plaintiff, ROSEMARIE ESTEVEZ, complains of violations of her constitutional rights guaranteed by the United States, federal and state law, and retaliation by her employer for engaging in protected conduct.

2.      Plaintiff's complaint arises in the context of protected public employment with the Clerk of Courts Office and is actionable under Title VII of the Civil Rights Act of 1964; 42 U.S.C. §2000 (e).

## PARTIES, JURISDICTION & VENUE

3.      This is an action for equitable relief and damages in excess of $50,000, and is otherwise within the jurisdiction of the circuit court.

4.      Plaintiff ROSEMARIE ESTEVEZ (hereinafter referred to by proper name "Plaintiff" or "Estevez") was at all times material hereto, a resident of Miami-Dade County, Florida, and an employee of  CLERK OF COURTS AND COMPTROLLER MIAMI-DADE COUNTY,  FLORIDA.

5.      Defendant, CLERK OF COURTS AND COMPTROLLER MIAMI-DADE COUNTY,  FLORIDA (hereinafter referred to as the "Clerk of Courts"), is a government entity, and at all times relevant hereto, was Plaintiff's employer,  employer of the individually named Defendants identified below, and pursuant to Fla. Stat., §194.015, Clerk of the ValueAdjustment Board of Miami-Dade County.

6.      Defendant, JUAN FERNANDEZ-BARQUIN, is CLERK OF COURTS AND COMPTROLLER MIAMI-DADE COUNTY, FLORIDA (hereinafter referred to as "Barquin" or "Barquin as Clerk of Court"), and serves in that capacity after being appointed by the governor on June 9, 2023. He is being sued in his official capacity of the CLERK OF COURTS AND COMPTROLLER MIAMI-DADE COUNTY, FLORIDA, and as the Clerk for the Value Adjustment Board of Miami-Dade County.

.      7.      Defendant,   RISA RUVIN, as Personal Representative of the Estate of HARVEY RUVIN is the personal representative of the former elected Clerk of Courts, HARVEY RUVIN,  now deceased (hereinafter referred to as "Ruvin" or  "Ruvin, as Clerk of Court").  Mr. Ruvin was at all times material hereto, the elected CLERK OF COURTS MIAMI-DADE COUNTY, FLORIDA, until he passed at the end of December 2022.  Mr. Ruvin was the highest-ranking elected official in the Miami-Dade County Clerk's Office. The Estate is being sued for acts Mr. Ruvin personally committed and for which he is personally responsible, which includes his failures to act, and for other omissions for which he was responsible, all of which also occurred while he was acting in his official capacity as Clerk of Courts and as Clerk for the Value Adjustment Board of Miami-Dade County. At all relevant times herein, Mr. Ruvin was Plaintiff's supervisor and had either immediate or successively higher authority over her as an employee of the Clerk of Courts.

8.      Defendant, MARK MARTINEZ (hereinafter referred to as the "Defendant" or "Martinez"), was at all relevant times employed by the Clerk of Courts and the duly appointed Senior Deputy for the Clerk of Courts, and a resident of Broward County, Florida.  He is being sued in his individual capacity, as well as in his official capacity, for

acts he personally committed, his failures to act, and for other omissions for which he was responsible, all of which occurred while he was acting in his capacity as Senior Deputy for the Clerk of Courts.   He was responsible for complying with and enforcing the Clerk of Courts' personnel policies and the policies of Miami-Dade County. At all relevant times herein, Mr. Martinez was Plaintiff's supervisor, and had either immediate or successively higher authority over her as an employee of the Clerk of Courts.

9.     Defendant, HOBART M. HENDERSON, *a/k/a* MIKE HENDERSON (hereinafter referred to as the "Defendant" or "Henderson"), was at all relevant times employed by the Clerk of Courts, was Chief of Staff for the Clerk of Courts, and a resident of Miami-Dade County, Florida.  He is being sued in his individual capacity, as well as in his official capacity as Chief of Staff for the Clerk of Courts, for acts he personally committed, his failures to act, and for other omissions for which he was responsible, all of which occurred while he was acting in his capacity as Chief of Staff.  Henderson was appointed to the position of the Clerk of Court's Chief of Staff on March 4, 2013, by the elected Clerk at the time, Mr. Ruvin.  Henderson was the second most senior official in the office chain of command, and was responsible for and had full authority to administer and enforce the Clerk of Courts' personnel policies and the policies of Miami-Dade County.  At all relevant times herein, Mr. Henderson was Plaintiff's supervisor and had either immediate or successively higher authority over her as an employee of the Clerk of Courts.

10.     Defendant, ROBERTO D. ALFARO (hereinafter referred to as the "Defendant" or "Alfaro"), was at all times relevant hereto, employed by the Clerk of Courts, and duly appointed as the manager of the Miami-Dade County Value Adjustment Board

for the Clerk of Courts, and a resident of Miami-Dade County, Florida.   He is being sued in his individual capacity, as well as in his official capacity, for acts he personally committed, his failures to act, and for other omissions for which he was responsible, all of which occurred while he was employed by the Clerk of Courts and manager of the Miami-Dade County Value Adjustment Board for the Clerk of Courts.   He was responsible for complying with and enforcing the Clerk of Courts' personnel policies and the policies of Miami-Dade County.  At all relevant times herein, Mr. Alfaro was Plaintiff's supervisor and had either immediate or successively higher authority over her as an employee of the Clerk of Courts.

11.    The  Clerk of Courts, including Mr. Barquin as Clerk of Courts and Mr. Ruvin as Clerk of Court,  is/are a "person"  within the meaning of 42 U.S.C. § 2000e(a), and employers within the meaning of 42 U.S.C. §§2000 e (b).

12.    Pursuant to Fla Stat., §194.015, the Clerk Value Adjustment Board of Miami-Dade County (also referred to as "VAB") is an administrative body organized pursuant to § 194.015, Fla. Stat.  Pursuant to §194.015, the Clerk of Courts is the clerk of the Value Adjustment Board of Miami-Dade County.

13.    The individual Defendants are being sued in their individual and official capacities for intentionally violating federal law while acting under color of state law.  In that Plaintiff's supervisors, including Mr.  Ruvin as Clerk of Court, Alfaro and Martinez, were responsible  for creating a hostile work environment for female employees of the Clerk of Court by harassing them, the Clerk of Courts' employees, the Clerk of Court, along with the Plaintiff's supervisors are liable.

-5-

14.     The facts complained of herein all occurred within Miami-Dade County, Florida.

15.     Plaintiff has satisfied the conditions precedent on her discrimination, sexual harassment, harassment, hostile working environment, and retaliation claims as required under Title VII, by filing a timely charge alleging discrimination based upon nationality, gender, and retaliation, and receiving a right to sue notice on August 16, 2023, a copy of which is attached hereto as _Exhibit "A_." This complaint, therefore, timely filed.

16.     At all material times hereto, the Clerk of Courts and  Miami-Dade County, Florida adopted written policies that prohibited workplace discrimination based on age, race, gender, and medical condition, as part of its personnel policy.   At all relevant times, none of the Defendants took steps to prevent or promptly correct the offensive behavior.

17.     At all times material hereto, the duly elected or appointed Clerk of Courts delegated the formulation, implementation, and enforcement of the written policies to its supervisors, the other individually named Defendants named herein.

18.     Plaintiff is a 55-year-old female.  She was an employee of Miami-Dade County Clerk of Courts, Florida, and was employed from October 29, 1990, until her employment conditions as described herein became so unbearable that rather than enter the Deferred Retirement Option Program (DROP), she chose to instead retire on December 31, 2021.  Her title was Court Operations Officer 1 with the Clerk's Office.  As a female, Estevez was a member of a protected class.  During all relevant times, she was

assigned to the VAB Unit.  Her supervisors at the time were Mr. Ruvin, as Clerk of the Court,  Alfaro and Martinez.

19.    On November 3, 2014, the elected Clerk, Mr.  Ruvin, appointed Martinez to the position of Senior Deputy for the Clerk of Courts.   Martinez was the third most senior official in the office chain of command and had the responsibility and full authority to administer and enforce the Clerk's Office's personnel policies and  policies of Miami-Dade County.

20.    On July 28, 2003, the Clerk of Courts appointed Defendant Alfaro as manager of the Clerk of Court's Value Adjustment Board.    At the beginning of every subsequent tax year at the Board's organizational meeting, the VAB reappointed Alfaro as its manager.

21.    Alfaro quickly demonstrated the Clerk's written  policies prohibiting discrimination were of little or no  concern for him, and had little or no regard for the feelings or sensitivities of the female employees of the Clerk of Courts affected by violations of these written policies.  He routinely demeaned, insulted, and harassed Plaintiff and similarly situated female employees of the Clerk of Court. For example, Alfaro referred to one of the female deputy clerks as "crazy and was a shop acholic," criticized another female employee at the Clerk of Courts for being married to another female, describing the employee and/or her marriage as disgusting and gross.   On the other hand,  male employees of the Clerk of Courts in classified service positions were not treated disparagingly.

22.     Such conduct created a perpetual sense of anxiety and emotional distress among the Clerk of Courts' female workforce, including Plaintiff, and created a chronically hostile work environment.

23.     While employed with the Clerk of Courts and assigned to the Clerks' VAB Unit, Plaintiff endured a course of conduct and pattern of harassment from Defendant Alfaro, as is more fully set forth and described in _Exhibit B_  attached hereto, the substance of which is incorporated herein as fully as if repeated verbatim.  The harassment was so severe or pervasive that it interferes with Plaintiff's ability to perform her work and/or changes the terms and conditions of her employment.

24.     On November 6, 2017, Plaintiff went to see Martinez to request a  transfer out of the VAB Unit due to the volatile, demeaning, and hostile environment she was working in.  Martinez denied her request and told her she had to make it work. After this meeting, Plaintiff decided to keep notes on all the incidents she had with Defendant Alfaro.

25.     On February 5, 2018, Alfaro was on vacation.  On that date, Plaintiff met with Martinez,  and informed him of a situation that an employee had recently reported to her. Plaintiff told Martinez that the employee informed her the conference room on the 17th floor was being used by employees to engage in sexual relations, and that one of the employees involved (a male employee) was continuously bringing a non-Clerk of Courts employee to the conference room to engage in sexual relations.  Plaintiff further informed Martinez that on the reporting employee's first week on the job, she also witnessed a female employee touching Mr. Alfaro's penis,  and that Alfaro then asked her to act as a lookout for him in case someone was to pass by.

-8-

26.     In response, Martinez told Plaintiff that she was liable for this type of behavior occurring in the office.  Plaintiff responded by telling Martinez she was reporting the situation to him, as her next in line supervisor, as she was required to do.  Plaintiff reminded Martinez that Alfaro, after he became manager of the Clerk of Courts,  had engaged in an ongoing affair with still another Clerk of Courts employee, which ultimately resulted in the employee's transfer out of the 111 building to avoid media attention which would have occurred if the employee was not transferred.  During this meeting, Plaintiff Estevez again requested that Martinez move her from this unit, and away from Alfaro. Martinez denied her request, telling her that she and  Alfaro were an excellent management combination.

27.     After this was reported was reported to Martinez, Martinez did nothing, and istead waited for Alfaro to return from his vacation, upon which a meeting took place at Martinez's attended by Martinez, Plaintiff and Alfaro.   The topic of this meeting related solely to the use of the conference room by employees to engage in sexual activity.  There was no discussion regarding the reporting employee having observed the female employee who was identified as using the conference room to engage in sexual activity, fondling Alfaro.

28.     At this meeting, and in front of Alfaro, Martinez directed Plaintiff to sit down with the female employee, and to do so with another supervisor, and simply ask that female employee if  she was engaging in sexual relations at work in the conference room. Plaintiff informed Martinez that protocol should be followed, and if  an investigation is to be conducted, that it be done as per protocol. Martinez told Plaintiff to do what he told her to

do.

29.     As directed by Martinez, Plaintiff later met with the female employee, who denied she had engaged in sexual relations in the conference room.  The reporting employee was not interviewed,  nor was the male employee, a lead worker with the Clerk of Courts at the time. Upon information and belief, Human Resources never became involved in this investigation, no written complaint or final report generated.

30.     On August 17, 2019, a female employee with the Clerk of Courts complained to  Martinez about comments made by Alfaro, and that Alfaro's treatment of female employees was unwarranted and constituted sexual harassment. A copy of the letter dated August 17, 2019, attached hereto as *Exhibit C.*  Martinez or Lisa Fernandez-Saboya ("Fernandez-Saboya") then directed Bibiana Candame ("Candame"), the Clerk of Courts Human Resource Manager, to conduct an "investigation."

31.     This  "investigation" was a sham.   Rather than reprimand, correct or terminate Alfaro for his conduct, Fernandez-Saboya, Candame and Martinez instead closed the investigation, again without Alfaro being terminated or otherwise  reprimanded. After this, Alfaro's harassment of the Plaintiff actually worsened.   The hostile work environment created by Alfaro continued unabated, tolerated or encouraged by all Defendants.

32.     On February 13, 2018, the Plaintiff met with Henderson.  In this meeting, Plaintiff told Defendant Henderson of the ongoing situation in the Clerk of Court's Value Adjustment Board Unit (also referred to as the "VAB"). She explained of the ongoing issues

relating to the manner in which Alfaro was treating her, which included disparaging her and undermining her supervisory authority in the office. Plaintiff explained that informed Henderson that she was being excluded from all meetings relating to the VAB with the Property Appraiser's Office, and Alfaro was identifying Scott Austin, a lead worker with the Clerk of Courts, as his right hand, rather than the Plaintiff.

33.    Henderson responded by telling Plaintiff what did she expect after having "made too much noise." When Plaintiff asked what was he referring to, Henderson told her it was because she had reported that Clerk of Court employees were using the conference room to engage in sexual relations.  Plaintiff then told Henderson that this was reported because it was her obligation to do so, and because the VAB unit was being used as a "boy's club," she wanted to be transferred elsewhere.

34.    Henderson then questioned Plaintiff's loyalty to Mr. Ruvin, the then Clerk of Courts, and whether she continued to complain about the hostile work environment because she may have formed some type of allegiance with a circuit court judge who was supposedly contemplating running against Mr. Ruvin, who as the Clerk of Court at the time, for the position of Clerk of Courts in the next election.   Plaintiff responded to Henderson by telling him her loyalties were to the office itself and the taxpayers, and again requested to be moved out of the VAB unit. Henderson told her she could not be moved from the VAB unit until the new computer system was implemented in the office.

35.    After this, Alfaro's illegal conduct continued unabated, and the hostile work environment did not improve. Plaintiff complained about the hostile work environment to Defendant Martinez on at least four more occasions, at least twice to Ruvin, in his capacity

-11-

as Clerk of Courts, and at least twice more to Henderson.  On each occasion, she asked that Alfaro's conduct be addressed, or that she be granted a transfer to another unit at the Clerk's Office so she would no longer be exposed to the hostile working environment. Nothing was done.

36.    In the last quarter of 2021, another female employee of the Clerk of Courts informed Clerk of Courts' Human Resources and Martinez that Alfaro was harassing her, trying to convince her to file a bogus harassment complaint against Plaintiff, so that Plaintiff would be terminated.  The employee also reported this  to the union and the Fair Employment office.

37.    Because Plaintiff complained about Alfaro and the hostile work environment she was being exposed to, the Clerk of Court denied Plaintiff her annual evaluations for the next two years, the period of February 2018 to February 2019, and then again from February 2019 to February 2020.  Plaintiff was not allowed to receive her pay increases unless the annual evaluations were generated.  Plaintiff reasonably believes that the annual evaluations were not done because she complained about the hostile work environment, which resulted in the denial of the compensation increment granted to similarly situated employees. While she was ultimately paid the monies due her two years later, this only occurred after she kept demanding her evaluations on a daily basis, until she was given  the evaluations on August 25, 2020.

38.    Denial of a monetary benefit was an adverse employment action and constituted retaliation by Defendants based on a discriminatory animus toward her, a female employee, who complained about gender-based discrimination.

39.     In addition, it had been Plaintiff's intent to enter DROP, and move up in the office to a higher-paying position, which would provide her with executive benefits. To do so, she was required to have a bachelor's degree acceptable to her employer.  As a result, she went to college and obtained that degree, but incurred student loan debt.

40.     Ultimately, in December of 2021, frustrated by the level of toxicity associated with working at the Clerk of Court's VAB unit, Plaintiff decided enough was enough.  She decided to forego her plans to enter DROP, and retired on December 20, 2021.

41.     After Mr. Alfaro was informed that Plaintiff was retiring, he openly commented to other Clerk employees that he had won the battle by forcing Ms. Estevez to retire. Mr. Alfaro thereafter threw "holy water" on Plaintiff's desk and about her office.

42.     The Defendants knew or should have known that discrimination and retaliation against employees such as Estevez for protected conduct was illegal.

43.     Plaintiff has been damaged by the constitutional violations of her right to be free of workplace discrimination in an amount to be proven at trial.

### COUNT 1 -
### COMPLAINT FOR GENDER BASED DISCRIMINATION
### Title VII,  42 U.S.C. §§2000E et seq.  - CLERK OF COURTS

44.     Plaintiff restates the allegations in paragraphs 1-43  as if fully set forth herein.

45.     Plaintiff was an employee and Clerk of Courts an employer within the meaning of Title VII.  As her employer, this Defendant  was empowered to take tangible employment  actions  against  Plaintiff  which  would  effect  significant  change  in  her

employment status, which included but was not limited to reassigning her to a different department with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

46.     As a female, Plaintiff is a member of a protected class.

47.     Gender discrimination is a form of discrimination protected by Title VII.

48.     At all times material, Plaintiff was a satisfactory or better employee with no reprimands or noted deficiencies throughout her employment.

49.      The ongoing daily mistreatment of Plaintiff by this Defendant as described herein, and despite Plaintiff dutifully and repeatedly notifying her supervisors that she was being subjected to personal humiliating attacks because of her gender placed Plaintiff in a constant hostile workplace environment constitutes un lawful discrimination in violation of Title VII.

50.     After Plaintiff and others complained about the conduct of her supervisors, this Defendant conducted sham investigations, which failed to address or correct her supervisors' illegal conduct.

51.     Under the totality of circumstances, the hostile work environment created by this Defendant was premeditated by discriminatory and gender-based insults and intimidating statements, and conduct sufficiently severe or persuasive to alter the terms, conditions, or privileges of employment. The harassment arose from a sexually discriminatory animus, and ultimately resulted in her retiring early from her employment with the Clerk(s) of Court.

52.    But for Plaintiff's gender, she would not have suffered the adverse employment action.

53.    This Defendant treated similarly situated male employees more favorably than the manner in which Plaintiff was treated.

54.    This Defendant knew, or should have known of the misconduct of its employees, did not take immediate and corrective action, and hence is vicariously liable for its employees' misconduct.

55.    As a result of Defendant's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of life, and damage to her professional reputation. She seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against Defendant, CLERK OF COURTS, for compensatory damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## COUNT 2 - EMPLOYMENT RETALIATION (TITLE VII) - CLERK OF COURTS

56.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set

forth herein.

57.    Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.

58.    As her employer, this Defendant  was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

59.    Plaintiff was qualified for her job with the Clerk of Courts performing well.

60.    Commencing July 2015 and continuing at all material times after that until she felt compelled to retire in December of 2021, Plaintiff exercised her protected rights by complaining about violations of federal and state discrimination laws and the policies of Clerk of Courts and Miami-Dade County, Florida prohibiting discrimination based on age, race, gender, and medical condition, and as a result, suffered an adverse employment action temporally related to her protected activity.

61.    Defendants knew Estevez had complained to her supervisors. This included notifying Martinez, beginning on November 6, 2017, until the day she advised him of her retirement. All Defendants knew that Plaintiff had been complaining and asking to be moved/transferred from the VAB Unit.

62.    After Estevez complained about unlawful and inappropriate acts by Alfaro, the hostile treatment of Plaintiff escalated.

63.     The work environment was sufficiently hostile and corrosive that Plaintiff's physical and mental health were causally affected requiring her to seek medical treatment.

64.     The illegal retaliation suffered by Plaintiff was a direct and proximate result, and  causally and temporally connected to her complaints about reporting the conference room incident and other concerns set forth above, and caused her to retire early.

65.     This Defendant knew, or should have known of the misconduct of its employees, did not take immediate and corrective action, and hence is vicariously liable for its employees' misconduct.

66.     As a  result of Defendant's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against  Defendant, CLERK OF COURTS, for compensatory damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

**COUNT 3 -**
**HOSTILE WORK ENVIRONMENT - SEXUAL HARASSMENT - CLERK OF COURTS**

67.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth.

68.    Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.

69.    As her employer, this Defendant  was empowered  to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

70.    As a female, Plaintiff is a member of a protected class.

71.    Plaintiff was subject to unwelcome sexual harassment, sexual advances, requests for sexual favors, and other conduct of a sexual nature, by Henderson, Chief of Staff for the Clerk of Courts, as is set forth below.

72.    Such conduct would not have occurred but for the gender of Plaintiff.

73.    Upon information and belief, the complained of behavior was not directed at male deputy clerks during Plaintiff's tenure.

72.    In June 2017, Plaintiff attended Mr. Ruvin's 80th birthday party at the Four Seasons Hotel, at which time Henderson told Plaintiff she should have been promoted due to her years of seniority and work ethic.  Henderson also told Plaintiff that she should know

he had promoted another female employee to a manager position, and the only reason that happened was  because "he was f****** her."

73.    This harassment was based on Plaintiff's sex.

74.    This harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

75.    The harassment created a discriminatorily abusive working environment. As a female employee working for the Clerk of Courts and whose supervisor was  Henderson, she was harassed by a male supervisor in a position of power. Henderson abused this position of power to inter alia, offer promotion and better working conditions in exchange for sex.

74.    This Defendant knew, or should  have known  of  the  misconduct  of  its employees, did not take immediate and corrective action, and hence is vicariously liable for its employees' misconduct.

75.    As a  result of Defendant's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against  Defendant, CLERK OF COURTS,  for compensatory damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

**COUNT 4 -**
**COMPLAINT FOR GENDER BASED DISCRIMINATION**
**Title VII,  42 U.S.C. §§2000E et seq.;  MR. BARQUIN AS CLERK OF COURTS**

76.     Plaintiff restates the allegations in paragraphs 1-43  as if fully set forth herein.

77.     This count is pleaded in the alternative to Count 1.

78.     Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.  Mr. Barquin became clerk upon the passing of Mr. Ruvin at year's end in 2022.

79.     As her employer, this Defendant  was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

80.     As a female, Plaintiff is a member of a protected class.

81.     Gender discrimination is a form of discrimination protected by Title VII.

82.     At all times material, Plaintiff was a satisfactory or better employee with no reprimands or noted deficiencies throughout her employment.

83.     The ongoing daily mistreatment of Plaintiff by the Clerk of Court as described herein,  and despite Plaintiff dutifully and repeatedly notifying her supervisors  that she was being subjected to personal humiliating attacks because of her gender placed Plaintiff in a constant hostile workplace environment constitutes un lawful discrimination in violation of Title VII.

84.     After  Plaintiff and others complained about the conduct of her supervisors, this Defendant conducted sham investigations, which failed to address or correct her supervisors' illegal conduct.

85.     Under the totality of circumstances, the hostile work environment created by the Clerk of Court was premeditated by discriminatory and gender-based insults and intimidating statements, and conduct sufficiently severe or persuasive to alter the terms, conditions, or privileges of employment. The harassment arose from a sexually discriminatory animus, and ultimately resulted in her retiring early from her employment with the Clerk(s) of Court.

86.     But for Plaintiff's gender, she would not have suffered the adverse employment action.

87.     The Clerk of Courts treated similarly situated male employees more favorably than the manner in which Plaintiff was treated.

88.     This Defendant knew, or should have known of the misconduct of its employees, did not take immediate and corrective action, and hence is vicariously liable for its employees' misconduct.

89.     As a  result of the Clerk of Courts' unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She  seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against  Defendant, MR. BARQUIN in his official capacity as CLERK OF COURTS, for compensatory damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## COUNT 5 -
## EMPLOYMENT RETALIATION (TITLE VII);  MR.  BARQUIN AS CLERK OF COURTS

90.     Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth herein.

91.     This Count is pleaded in the alternative to Count 2.

92.     Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII. Mr. Barquin as Clerk of Court became clerk of courts upon the passing of Mr. Ruvin at year's end in 2022.

93.     As  her  employer,  this  Defendant   was  empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

94.     Plaintiff was qualified for her job with the clerk of court and always performed her job well.

95.     Commencing July 2015 and continuing at all material times after that until she felt compelled to retire in December of 2021, Plaintiff exercised her protected rights by complaining about violations of federal and state discrimination laws and the policies of the Clerk of Courts and Miami-Dade County, Florida prohibiting discrimination based on age, race, gender, and medical condition, and as a result, suffered an adverse employment action temporally related to her protected activity.

96.     The Clerk of Courts knew Estevez had complained to her supervisors.  This included  notifying Mr. Martinez, beginning on November 6, 2017, until the day she advised him of her retirement. All Defendants knew that Plaintiff had been complaining and asking to be moved/transferred from the VAB Unit.

97.     After Estevez complained about unlawful and inappropriate acts by Alfaro, the hostile treatment of Plaintiff escalated.

98.     The work environment was sufficiently hostile and corrosive that Plaintiff's physical and mental health were causally affected requiring her to seek medical treatment.

99.    The illegal retaliation suffered by Plaintiff was a direct and proximate result, and  causally and temporally connected to her complaints about reporting the conference room incident and other concerns set forth above, and caused her to retire early.

100.    This Defendant knew, or should have known of the misconduct of its employees, did not take immediate and corrective action, and hence is vicariously liable for its employees' misconduct.

101.    As a  result of the Clerk of Court's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She  seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against  Defendant, MR. BARQUIN in his official capacity as CLERK OF COURTS,  for compensatory damages, all costs incurred,  such  further  necessary  or  proper  relief  the  Court  deems  appropriate,  and demands trial by jury on all issues so triable of right.

**COUNT 6 -**
**HOSTILE WORK ENVIRONMENT -**
**<u>SEXUAL HARASSMENT; MR. BARQUIN AS CLERK OF COURTS</u>**

102.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth.

103.    This Count is pleaded in the alternative to Count 3.  Plaintiff was an employee and te Clerk of Courts was an employer within the meaning of Title VII.

104.    As her employer, this Defendant   was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

105.    As a female, Plaintiff is a member of a protected class.

106.    Plaintiff was subject to unwelcome sexual harassment, sexual advances, requests for sexual favors, and other conduct of a sexual nature, by Mr. Henderson, Chief of Staff for the Clerk of Courts, as is set forth below.

107.    Such conduct would not have occurred but for the gender of Plaintiff.

108.    Upon information and belief, the complained of behavior was not directed at male deputy clerks during Plaintiff's tenure.

109..   In June 2017, Plaintiff attended Mr. Ruvin's 80th birthday party at the Four Seasons Hotel, at which time Henderson told Plaintiff she should have been promoted due to her years of seniority and work ethic.  Henderson also told Plaintiff that she should know he had promoted another female employee to a manager position, and the only reason that happened was  because "he was f****** her."

110.    This harassment was based on Plaintiff's sex.

111.    This harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

112.    The harassment created a discriminatorily abusive working environment. As a female employee working for the Clerk of Courts and whose supervisor was Henderson, she was harassed by a male supervisor in a position of power. Henderson abused this position of power to inter alia, offer promotion and better working conditions in exchange for sex.

113.    This Defendant knew, or should have known of the misconduct of its employees, did not take immediate and corrective action, and hence is vicariously liable for its employees' misconduct.

114.    As a result of the Clerk of Court's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of life, and damage to her professional reputation. She seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against Defendant, MR. BARQUIN in his official capacity as CLERK OF COURTS, for compensatory and punitive damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

**COUNT 7 -**
**COMPLAINT FOR GENDER BASED DISCRIMINATION**
**Title VII, 42 U.S.C. §§2000E et seq.;**
**MR. RUVIN. INDIVIDUALLY, AND IN HIS CAPACITY AS CLERK OF COURTS**

115.   Plaintiff restates the allegations in paragraphs 1-43 as if fully set forth herein.

116.   This count is pleaded in the alternative to Counts 1 and 4.

117.   Plaintiff was an employee and the Clerk of Courts, including the time in which Mr. Ruvin was the Clerk of Courts.   He is individually liable for committing the discriminatory acts described herein.   The Clerk of Courts was an employer within the meaning of Title VII.

118.    As her employer, and her supervisor, Mr. Ruvin  was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

119.   As a female, Plaintiff is a member of a protected class.

120.   Gender discrimination is a form of discrimination protected by Title VII.

121.   At all times material, Plaintiff was a satisfactory or better employee with no

reprimands or noted deficiencies throughout her employment.

122.    The ongoing daily mistreatment of Plaintiff by the Clerk of Court during Mr. Ruvin's tenure as Clerk of Courts, as is described herein,  and despite Plaintiff dutifully and repeatedly notifying her supervisors  that she was being subjected to personal humiliating attacks because of her gender placed Plaintiff in a constant hostile workplace environment, and constitutes unlawful discrimination in violation of Title VII.

123.    After  Plaintiff and others complained about the conduct of her supervisors, the Clerk of Courts conducted sham investigations, which failed to address or correct her supervisors' illegal conduct.

124.    Under the totality of circumstances, the hostile work environment created by the Clerk of Courts during Mr. Ruvin's tenure was premeditated by discriminatory and gender-based insults and intimidating statements, and conduct sufficiently severe or persuasive to alter the terms, conditions, or privileges of employment. The harassment arose from a sexually discriminatory animus, and ultimately resulted in her retiring early from her employment with the Clerk of Court.

125.   But for Plaintiff's gender, she would not have suffered the adverse employment action.

126.   During Mr. Ruvin's tenure as  Clerk of Courts, the Clerks of Courts treated similarly situated male employees more favorably than the manner in which Plaintiff was treated.

127.   This Defendant knew, or should have known of the misconduct of its

employees, did not take immediate and corrective action, and hence is vicariously liable for its employees' misconduct.

128.    As a  result of the Clerk of Courts' unlawful discrimination and violations of Title VII during Mr. Ruvin's tenure, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of life, and damage to her professional reputation. She  seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against Defendant, MR. RUVIN, for acts committed by him in individually and in his official capacity as CLERK OF COURTS, for compensatory damages, punitive damages (individual capacity),  all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

**COUNT 8 -**
**EMPLOYMENT RETALIATION (TITLE VII);**
**MR.  RUVIN, INDIVIDUALLY, AND IN HIS CAPACITY AS CLERK OF COURTS**

129.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth herein.

130.    This Count is pleaded in the alternative to Count 2 and 5.

131.    Plaintiff was an employee and the Clerk of Courts, including the time in which Mr. Ruvin was the Clerk of Courts. He is individually liable for committing the discriminatory acts described herein.  The Clerk of Courts was an employer within the meaning of Title VII.

132.    As her employer, and her supervisor, Mr. Ruvin  was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

133.    Plaintiff was qualified for her job with the clerk of court and always performed her job well.

134.    Commencing July 2015 and continuing at all material times after that until she felt compelled to retire in December of 2021, Plaintiff exercised her protected rights by complaining about violations of federal and state discrimination laws and the policies of the Clerk of Courts and Miami-Dade County, Florida prohibiting discrimination based on age, race, gender, and medical condition, and as a result, suffered an adverse employment action temporally related to her protected activity.

135.    Mr. Ruvin and the Clerk of Courts knew Estevez had complained to her supervisors.  This  included notifying Mr. Martinez, beginning on November 6, 2017, until the day she advised him of her retirement. All Defendants knew that Plaintiff had been complaining and asking to be moved/transferred from the VAB Unit.

136.    After Estevez complained about unlawful and inappropriate acts by Alfaro, the hostile treatment of Plaintiff escalated.

137.    The work environment was sufficiently hostile and corrosive that Plaintiff's physical and mental health were causally affected requiring her to seek medical treatment.

138.    The illegal retaliation suffered by Plaintiff was a direct and proximate result, and  causally and temporally connected to her complaints about reporting the conference room incident and other concerns set forth above, and caused her to retire early.

139.    This Defendant's own conduct was illegal, and he also knew or should have known of the misconduct of the Clerk's supervisors/employees, but did not take immediate and corrective action.  He is individually liable for his own misconduct, and the Clerk is vicariously liable for the misconduct of its employees.

140.    As a  result of Mr. Ruvin's, and the Clerk of Court's unlawful discrimination and violations of Title VII which took place during Mr. Ruvin's tenure as Clerk of Courts, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against  Defendant, MR. RUVIN, individually and in his official capacity as CLERK OF COURTS, for compensatory damages, punitive damages (individual capacity),  all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

**COUNT 9 -**
**HOSTILE WORK ENVIRONMENT - SEXUAL HARASSMENT**
**MR. RUVIN, INDIVIDUALLY, AND AS CLERK OF COURTS**

141.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth.

142.    This Count is pleaded in the alternative to Count 3 and 6.

143.    Plaintiff was an employee and the Clerk of Courts, including the time in which Mr. Ruvin was the Clerk of Courts.   He is individually liable for committing the discriminatory acts described herein.

144.    Plaintiff was an employee and te Clerk of Courts was an employer within the meaning of Title VII.

145.    As her employer, and her supervisor, Mr. Ruvin  was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

146.    As a female, Plaintiff is a member of a protected class.

147.    Plaintiff was subject to unwelcome sexual harassment, sexual advances, requests for sexual favors, and other conduct of a sexual nature, by Mr. Henderson, Chief of Staff for the Clerk of Courts, as is set forth below.

148.    Such conduct would not have occurred but for the gender of Plaintiff.

149.    Upon information and belief, the complained of behavior was not directed at male deputy clerks during Plaintiff's tenure.

72.    In June 2017, Plaintiff attended Mr. Ruvin's 80th birthday party at the Four Seasons Hotel, at which time Henderson told Plaintiff she should have been promoted due to her years of seniority and work ethic.  Henderson also told Plaintiff that she should know he had promoted another female employee to a manager position, and the only reason that happened was  because "he was f****** her."

73.    This harassment was based on Plaintiff's sex.

74.    This harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

75.    The harassment created a discriminatorily abusive working environment. As a female employee working for the Clerk of Courts and whose supervisor was  Henderson, she was harassed by a male supervisor in a position of power. Henderson abused this position of power to inter alia, offer promotion and better working conditions in exchange for sex.

-33-

150.    This Defendant's own conduct was illegal, and he knew or should have known of the misconduct of the Clerk's supervisors/employees, but did not take immediate and corrective action.  He is individually liable for his own misconduct, and the Clerk is vicariously liable for the misconduct of its employees.

151.    As a  result of the Clerk of Court's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She  seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against  Defendant, MR. RUVIN, individually and in his official capacity as CLERK OF COURTS, for compensatory damages, punitive damages (individual capacity),   all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

### COUNT 10 -
### COMPLAINT FOR GENDER BASED DISCRIMINATION
### Title VII,  42 U.S.C. §§2000E et seq.;  MR.  ALFARO

152.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth herein.

153.   Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.

154.   At all relevant time hereto, Mr. Alfaro personally committed the misconduct described herein.  At all relevant times, Mr. Alfaro was Plaintiff's supervisor at the Clerk of Court, and as her supervisor, he is individually liable for his misconduct and discriminatory actions.

155.   As Plaintiff's supervisor, Mr. Alfaro was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

156.   Plaintiff was qualified for her job with the clerk of court and always performed her job in a satisfactory manner.

157.   Commencing July 2015 and continuing at all material times after that until she felt compelled to retire in December of 2021, Plaintiff exercised her protected rights by complaining about violations of federal and state discrimination laws and the policies of the Clerk of Courts and Miami-Dade County, Florida prohibiting discrimination based on age, race, gender, and medical condition, and as a result, suffered an adverse employment action temporally related to her protected activity.

158.   Mr. Alfaro knew Estevez had complained to him, Mr. Ruvin and her other supervisors about his conduct.   He, and the other individually named Defendants and

Clerk of Court, all knew that Plaintiff had been complaining and asking to be moved/transferred from the VAB Unit because of the ongoing misconduct.

159.    After Estevez complained about unlawful and inappropriate acts by Alfaro, the hostile treatment of Plaintiff escalated.

160.    The work environment was sufficiently hostile and corrosive that Plaintiff's physical and mental health were causally affected requiring her to seek medical treatment.

161.    The illegal retaliation suffered by Plaintiff was a direct and proximate result, and  causally and temporally connected to her complaints about reporting the conference room incident and other concerns set forth above, and caused her to retire early.

162.    As Plaintiff's supervisor, he is individually liable for his own misconduct.

163.    As a  result of this Defendant's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against  Defendant, MR. ALFARO, for compensatory and punitive costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

**COUNT 11 -**
**EMPLOYMENT RETALIATION (TITLE VII); MR. ALFARO**

164.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth herein.

165.    Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.

166.    At all relevant time hereto, Mr. Alfaro personally committed the misconduct described herein.  At all relevant times, Mr. Alfaro was Plaintiff's supervisor at the Clerk of Court, and as her supervisor, he is individually liable for his misconduct and discriminatory actions.

167.    As Plaintiff's supervisor, Mr. Alfaro was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

168.    Plaintiff was qualified for her job with the clerk of court and always performed her job well.

169.    Commencing July 2015 and continuing at all material times after that until she felt compelled to retire in December of 2021, Plaintiff exercised her protected rights by complaining about violations of federal and state discrimination laws and the policies of the Clerk of Courts and Miami-Dade County, Florida prohibiting discrimination based on

age, race, gender, and medical condition, and as a result, suffered an adverse employment action temporally related to her protected activity.

170.    Mr. Alfaro knew Estevez had complained to Mr. Ruvin, as well as to him, and her other supervisors.  This  included notifying Mr. Martinez, beginning on November 6, 2017, until the day she advised him of her retirement. All Defendants knew that Plaintiff had been complaining and asking to be moved/transferred from the VAB Unit.

171.    After Estevez complained about unlawful and inappropriate acts by Mr. Alfaro, the hostile treatment of Plaintiff escalated.

172.    The work environment was sufficiently hostile and corrosive that Plaintiff's physical and mental health were causally affected requiring her to seek medical treatment.

173.    The illegal retaliation suffered by Plaintiff was a direct and proximate result, and  causally and temporally connected to her complaints about reporting the conference room incident and other concerns set forth above, and caused her to retire early.

174.    As Plaintiff's supervisor, he is individually liable for his own misconduct.

175.    As a  result of Mr. Alfaro's misconduct, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of life, and damage to her professional reputation. She   seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the

future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against Defendant, MR. ALFARO, for compensatory and punitive damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## COUNT 12 -
## HOSTILE WORK ENVIRONMENT -
## SEXUAL HARASSMENT; MR. ALFARO

176. Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth.

177. Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII. At all relevant times, Mr. Alfaro was Plaintiff's supervisor at the Clerk of Court, and as her supervisor, he is individually liable for his misconduct and discriminatory actions.

178. As Plaintiff's supervisor, Mr. Alfaro was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

179. As a female, Plaintiff is a member of a protected class.

180.   Plaintiff was subject to unwelcome sexual harassment, sexual advances, requests for sexual favors, and other conduct of a sexual nature, by Mr. Alfaro.

181.   Such conduct would not have occurred but for the gender of Plaintiff.

182.   Upon information and belief, the complained of behavior was not directed at male deputy clerks during Plaintiff's tenure.   The harassment directed at Plaintiff was based on Plaintiff's sex.

183.   This harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

184.   The harassment created a discriminatorily abusive working environment. As a female employee working for the Clerk of Courts and whose supervisor was Mr. Alfaro, she was harassed by a male supervisor in a position of power.

185.   As Plaintiff's supervisor, he is individually liable for his own misconduct.

186.   As a  result of the Mr. Alfaro's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against Defendant, MR. ALFARO, for compensatory and punitive damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## COUNT 13 -
## COMPLAINT FOR GENDER BASED DISCRIMINATION
## Title VII, 42 U.S.C. §§2000E et seq.; MR. MARTINEZ

187.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth herein.

188.    Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.

189.    At all relevant time hereto, Mr. Martinez personally committed the misconduct described herein. At all relevant times, Mr. Martinez was Plaintiff's supervisor at the Clerk of Court, and as her supervisor, he is individually liable for his misconduct and discriminatory actions.

190.    As Plaintiff's supervisor, Mr. Martinez was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

191.    Plaintiff was qualified for her job with the clerk of court and always performed her job in a satisfactory manner.

192.    Commencing July 2015 and continuing at all material times after that until she felt compelled to retire in December of 2021, Plaintiff exercised her protected rights by complaining about violations of federal and state discrimination laws and the policies of the Clerk of Courts and Miami-Dade County, Florida prohibiting discrimination based on age, race, gender, and medical condition, and as a result, suffered an adverse employment action temporally related to her protected activity.

193.    Mr. Martinez knew Estevez had complained to him, Mr. Ruvin and her other supervisors about misconduct described herein.   He, and the other individually named Defendants and Clerk of Court, all knew that Plaintiff had been complaining and asking to be moved/transferred from the VAB Unit because of the ongoing misconduct.

194.    After Estevez complained about unlawful and inappropriate acts by Mr. Alfaro, the hostile treatment of Plaintiff escalated.

195.    The work environment was sufficiently hostile and corrosive that Plaintiff's physical and mental health were causally affected requiring her to seek medical treatment.

196.    The illegal retaliation suffered by Plaintiff was a direct and proximate result, and  causally and temporally connected to her complaints about reporting the conference room incident and other concerns set forth above, and caused her to retire early.

197.    As Plaintiff's supervisor, he is individually liable for his own misconduct.

198.    As a  result of this Defendant's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She

seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against Defendant, MR. MARTINEZ, for compensatory and punitive damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## COUNT 14 -
## EMPLOYMENT RETALIATION (TITLE VII); MR. MARTINEZ

199.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth herein.

200.    Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.

201.    At all relevant time hereto, Mr. Martinez personally committed the misconduct described herein.  At all relevant times, Mr. Martinez was Plaintiff's supervisor at the Clerk of Court, and as her supervisor, he is individually liable for his misconduct and discriminatory actions.

202.    As Plaintiff's supervisor, Mr. Martinez was empowered to take tangible employment actions against Plaintiff which would effect significant change in her

employment status, which included but was not limited to reassigning her to a different department with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

203.    Plaintiff was qualified for her job with the clerk of court and always performed her job well.

204.    Commencing July 2015 and continuing at all material times after that until she felt compelled to retire in December of 2021, Plaintiff exercised her protected rights by complaining about violations of federal and state discrimination laws and the policies of the Clerk of Courts and Miami-Dade County, Florida prohibiting discrimination based on age, race, gender, and medical condition, and as a result, suffered an adverse employment action temporally related to her protected activity.

205.    Mr. Martinez knew Estevez had complained to Mr. Ruvin, as well as to him, and her other supervisors about misconduct described herein.    This included notifying Mr. Martinez, beginning on November 6, 2017, until the day she advised him of her retirement. All Defendants knew that Plaintiff had been complaining and asking to be moved/transferred from the VAB Unit.

206.    After Estevez complained about unlawful and inappropriate acts by Mr. Alfaro, the hostile treatment of Plaintiff escalated.

207.    The work environment was sufficiently hostile and corrosive that Plaintiff's physical and mental health were causally affected requiring her to seek medical treatment.

208.    The illegal retaliation suffered by Plaintiff was a direct and proximate result, and  causally and temporally connected to her complaints about reporting the conference room incident and other concerns set forth above, and caused her to retire early.

209.    As Plaintiff's supervisor, he is individually liable for his own misconduct.

210.    As a   result of Mr. Martinez's misconduct, Plaintiff  incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She  seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against Defendant, MR. MARTINEZ, for compensatory and punitive damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## COUNT 15 -
## HOSTILE WORK ENVIRONMENT -
## SEXUAL HARASSMENT; MR. MARTINEZ

211.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth.

212.    Plaintiff was an employee and the Clerk of Courts was an employer within the

meaning of Title VII.  At all relevant times, Mr. Martinez was Plaintiff's supervisor at the Clerk of Court, and as her supervisor, he is individually liable for his misconduct and discriminatory actions.

213.   As Plaintiff's supervisor, Mr. Martinez was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

214.   As a female, Plaintiff is a member of a protected class.

215.   Plaintiff was subject to unwelcome sexual harassment, sexual advances, requests for sexual favors, and other conduct of a sexual nature, by her supervisors.

216.   Such conduct would not have occurred but for the gender of Plaintiff.

217.   Upon information and belief, the complained of behavior was not directed at male deputy clerks during Plaintiff's tenure.  The harassment directed at Plaintiff was based on Plaintiff's sex.

218.   This harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

219.   The harassment created a discriminatorily abusive working environment. As a female employee working for the Clerk of Courts and whose supervisor was Mr. Martinez, she was harassed by a male supervisor in a position of power.

220.    As Plaintiff's supervisor, he is individually liable for his own misconduct.

221.    As a result of the Mr. Martinez's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of life, and damage to her professional reputation. She seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against Defendant, MR. MARTINEZ, for compensatory and punitive damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## COUNT 16 -
## COMPLAINT FOR GENDER BASED DISCRIMINATION
## Title VII, 42 U.S.C. §§2000E et seq.; MR. HENDERSON

222.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth herein.

223.    Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.

224.    At all relevant time hereto, Mr. Henderson personally committed the misconduct described herein. At all relevant times, he was Plaintiff's supervisor at the

Clerk of Court, and as her supervisor, he is individually liable for his misconduct and discriminatory actions.

225.   As Plaintiff's supervisor, Mr. Henderson was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

226.   Plaintiff was qualified for her job with the clerk of court and always performed her job in a satisfactory manner.

227.   Commencing July 2015 and continuing at all material times after that until she felt compelled to retire in December of 2021, Plaintiff exercised her protected rights by complaining about violations of federal and state discrimination laws and the policies of the Clerk of Courts and Miami-Dade County, Florida prohibiting discrimination based on age, race, gender, and medical condition, and as a result, suffered an adverse employment action temporally related to her protected activity.

228.   Mr. Henderson knew Estevez had complained to him, Mr. Ruvin and her other supervisors about misconduct described herein.   He, and the other individually named Defendants and Clerk of Court, all knew that Plaintiff had been complaining and asking to be moved/transferred from the VAB Unit because of the ongoing misconduct.

229.   After Estevez complained about unlawful and inappropriate acts by Mr. Alfaro, the hostile treatment of Plaintiff escalated.

-48-

230.    The work environment was sufficiently hostile and corrosive that Plaintiff's physical and mental health were causally affected requiring her to seek medical treatment.

231.    The illegal retaliation suffered by Plaintiff was a direct and proximate result, and  causally and temporally connected to her complaints about reporting the conference room incident and other concerns set forth above, and caused her to retire early.

232.    As Plaintiff's supervisor, he is individually liable for his own misconduct.

233.    As a  result of this Defendant's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE  the  Plaintiff  demands  judgment  against    Defendant,  MR. HENDERSON,  for compensatory and punitive damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## COUNT 17
## EMPLOYMENT RETALIATION (TITLE VII) - MR. HENDERSON

234.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth herein.

235.    Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.

236.    At all relevant time hereto, Mr. Henderson personally committed the misconduct described herein.  At all relevant times, he was Plaintiff's supervisor at the Clerk of Court, and as her supervisor, he is individually liable for his misconduct and discriminatory actions.

237.    As Plaintiff's supervisor, Mr. Henderson was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

238.    Commencing July 2015 and continuing at all material times after that until she felt compelled to retire in December of 2021, Plaintiff exercised her protected rights by complaining about violations of federal and state discrimination laws and the policies of the Clerk of Courts and Miami-Dade County, Florida prohibiting discrimination based on age, race, gender, and medical condition, and as a result, suffered an adverse employment action temporally related to her protected activity.

239.    Mr. Henderson knew Estevez had complained to Mr. Ruvin, as well as to him, and her other supervisors about misconduct described herein.  This  included notifying Mr. Martinez, beginning on November 6, 2017, until the day she advised him of her retirement.

All Defendants knew that Plaintiff had been complaining and asking to be moved/transferred from the VAB Unit.

240.   After Estevez complained about unlawful and inappropriate acts by Mr. Alfaro, the hostile treatment of Plaintiff escalated.

241.   The work environment was sufficiently hostile and corrosive that Plaintiff's physical and mental health were causally affected requiring her to seek medical treatment.

242.   The illegal retaliation suffered by Plaintiff was a direct and proximate result, and  causally and temporally connected to her complaints about reporting the conference room incident and other concerns set forth above, and caused her to retire early.

243.   As Plaintiff's supervisor, he is individually liable for his own misconduct.

244.   As a  result of Mr. Henderson's misconduct, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She  seeks back pay, front pay, reinstatement, and an award of non-economic damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against   Defendant, MR. HENDERSON,  for compensatory and punitive damages, all costs incurred, such further

necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## COUNT 18 -
## HOSTILE WORK ENVIRONMENT -
## SEXUAL HARASSMENT; MR. HENDERSON

245.    Plaintiff restates the allegations contained in paragraphs 1-43 as if fully set forth.

246.    Plaintiff was an employee and the Clerk of Courts was an employer within the meaning of Title VII.  At all relevant times, Mr. Henderson was Plaintiff's supervisor at the Clerk of Court, and as her supervisor, he is individually liable for his misconduct and discriminatory actions.

247.    As Plaintiff's supervisor, Mr. Henderson was empowered to take tangible employment actions against Plaintiff which would effect significant change in her employment status, which included but was not limited to reassigning her to a different department  with significantly different responsibilities, or in making decisions pertaining to significant changes in her benefits.

248.    As a female, Plaintiff is a member of a protected class.

249.    Plaintiff was subject to unwelcome sexual harassment, sexual advances, requests for sexual favors, and other conduct of a sexual nature, by Mr. Henderson, Chief of Staff for the Clerk of Courts, as is set forth below.

72.    In June 2017, Plaintiff attended Ruvin's 80th birthday party at the Four Seasons Hotel, at which time Mr. Henderson told Plaintiff she should have been promoted

due to her years of seniority and work ethic.  Henderson also told Plaintiff that she should know he had promoted another female employee to a manager position, and the only reason that happened was  because "he was f****** her."

250.    This harassment was based on Plaintiff's sex.    Such conduct would not have occurred but for the gender of Plaintiff.  Upon information and belief, the complained of behavior was not directed at male deputy clerks during Plaintiff's tenure.

251.    This harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

252.    The harassment created a discriminatorily abusive working environment. As a female employee working for the Clerk of Courts and whose supervisor was Mr. Henderson, she was harassed by a male supervisor in a position of power. Mr. Henderson abused this position of power to inter alia, offer promotion and better working conditions in exchange for sex.

253.    The harassment created a discriminatorily abusive working environment. As a female employee working for the Clerk of Courts and whose supervisor was Mr. Martinez, she was harassed by a male supervisor in a position of power.

254.    And, as Plaintiff's supervisor, he is individually liable for his own misconduct.

255.    As a  result of the Mr. Henderson's unlawful discrimination and violations of Title VII, Plaintiff incurred damages including, but not limited to, lost income, emotional distress, mental anguish, loss of enjoyment of  life, and damage to her professional reputation. She  seeks back pay, front pay, reinstatement, and an award of non-economic

damages for mental anguish, emotional distress, loss of dignity, mental anguish, pain and suffering, loss of capacity for the enjoyment of life, incurred medical expenses, and will continue to incur medical bills in the future; award reasonable attorney's fees per statute and costs of suit; and for such other and further relief as to the court appears just and proper.

WHEREFORE the Plaintiff demands judgment against Defendant, MR. MARTINEZ, for compensatory and punitive damages, all costs incurred, such further necessary or proper relief the Court deems appropriate, and demands trial by jury on all issues so triable of right.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all counts.

LAW OFFICE OF
MICHAEL GARCIA PETIT, P.A.
Michael Garcia Petit, Esq.
Counsel for Plaintiff
P.O. Box 278515
Miramar, Florida 33027
Phone: (786) 245-7750
Designated E-Mail Addresses:
Michael@Michaelgarciapetitpa.com
mail@michaelgarciapetitpa.com

BY: *s/Michael Garcia Petit*
    MICHAEL GARCIA PETIT
    FBN: 656216

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed via CM/ECF on February 28, 2024.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

## LIST OF COUNSEL

GERALDINE BONZON-KEENAN
Miami-Dade County Attorney
Counsel for the Clerk of Courts Defendants
Miami-Dade County
Rochelle A. Hall, Esq.
Marlon D. Moffett, Esq.
Email: Rochelle.Hall@miamidade.gov
mdm2@miamidade.gov
dmh@miamidade.gov

HOLLAND & KNIGHT LLP
Counsel for VAB Defendants
Edward Diaz. Esq.
Email: edward.diaz@hklaw.com
Jose A. Casal, Esq.
Email: jose.casal@hklaw.com
Lisa Kohring, Esq.
Email: lisa.kohring@hklaw.com


*/s/ Michael Garcia Petit*
MICHAEL GARCIA PETIT

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Miami District Office**
100 SE 2nd St, Suite 1500
Miami, FL 33131
(800) 669-4000
Website: www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 08/16/2023

**To:** Miss Rosemarie Estevez
1407 San Marco Avenue
CORAL GABLES, FL 33134
Charge No: 510-2022-03890

EEOC Representative and email:   NILIA MARTI
Investigator
Nilia.Marti@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 510-2022-03890.

On behalf of the Commission,

Digitally Signed By:Evangeline Hawthorne
08/16/2023

Evangeline Hawthorne
Director

## EXHIBIT A

**Cc:**
Melvy  Perez
Miami-Dade County Attorney's Office
111 NW 1ST ST STE 2810
Miami, FL 33128

Marlon  Moffett
Miami-Dade County Attorney's Office
111 NW 1ST ST STE 2810
Miami, FL 33128

Michael   Garcia Petit
Michael Garcia Petit, PA
P.O. Box 278515
MIRAMAR, FL 33027


Please retain this notice for your records.

1. I started working in the Clerk of Court (COC) on October 29, 1990; and worked for the clerk's office for over 30 years and retired on December 31, 2021. While I worked at the COC, I held several positions. I was a Court Records Specialist 1, Courtroom Clerk 2, Court Room Clerk Lead Worker, Court Records Supervisor 1, Court Records Supervisor 2, Court Records Supervisor 3, and Court Operations Officer 1.

2. In July 2015, I was transferred from the County Recorder's Office to the Value Adjustment Board (VAB) for a special project to identify the job responsibilities of each employee in the VAB and how the new computer system will affect their performance. I was asked to produce a flow chart of how the staff would perform the work when the new computer system was in place. Additionally, I was to report directly to Mark Martinez.

3. While I was conducting my review of the office to produce a flow chart, I was informed by three employees (NO, Angela Cruayans, and LG) that before I arrived to work at the VAB, Mr. Alfaro had a meeting on the 6th floor precisely in front of the freight elevators, with all the employees advising them that I was going to be in the office.  He told them he did not know why I would be there but not to speak with me, not to have contact with me, and to stay away from me as I reported directly to Mark Martinez.

4. I finished reviewing and identifying all the positions in the VAB within two weeks and asked to be returned to the County Recorder's Office.  Mr. Martinez told me that he wanted me to remain in the VAB and monitor and report any situation there.  He told me not to trust Mr. Alfaro, as he once betrayed Mr. Martinez with Mr. Ruvin. He further explained the case in the VAB as not being appropriately managed.  Mr. Martinez told me about another manager present during interviews and what had transpired, which was not part of the county procedures. Mr. Martinez told me I was transferred permanently to the VAB.

5. On September 25, 2015, I started to date the COC HR Director, Antonio Gonzalez.  Mr. Gonzalez was the previous COC Attorney but had moved away from Miami ten (10) years before raising his children. Mr. Ruvin allowed Mr. Gonzalez to return to work in the office as the HR Director. Some of my problems began when I attended a dinner at Mr. Ruvin's home, and the COC Chief of Staff, Hobart M. Henderson, a/k/a Mike Henderson, saw Mr. Gonzalez and me together.  At this dinner, I saw and heard Mr. Henderson tell Mr. Ruvin that Mr. Gonzalez and I were trouble, and he did not like that we were dating.  I was surprised at this statement because I never had done anything in the office to make Mr. Henderson make that comment. However, I know that the feud between Mr. Gonzalez and Mr. Henderson continued for many years.

6. Every time Mr. Henderson would see me either in the office or the streets, he told me that all attorneys were assholes. In one of our conversations, Mr. Henderson asked me how I ended up dating Mr. Gonzalez.  He said he did not understand the relationship.  I just told him it just happened when he was helping me to study for the LSAT.  He would always say we don't need more attorneys.

7. During the first couple of months that I worked in the VAB, I noticed several things in the VAB that were outside the county's procedures or requirements.  There was a lot of tardiness and absences in the office. The employees would not call in to inform the office of their delay, which resulted in shifting clerks around or giving clerks multiple boards to attend at a time. Employees would bring their children to work and leave them sitting inside the office. Additionally, no one was cross-trained. If an employee is on Family Leave, the work would sit at the desk until the employee returns.  In addition, Mr. Alfaro was having problems with the VAB Attorney, and he

1

**EXHIBIT B**

could not get him to complete his work. Mr. Alfaro asked me to help him with the situation with the VAB Attorney. Mr. Martinez asked to meet with Mr. Alfaro and me to review my observations. I made several suggestions to Mr. Martinez in front of Mr. Alfaro. For example, I suggested cross-training all the employees and writing up employees who had tardiness issues or frequent unapproved absences. In this meeting, Mr. Alfaro seemed upset with my tips.

8.  Mr. Alfaro assigned me to work out the 6th-floor hearing rooms to monitor the clerks inside the hearing room. A VAB employee, LG informed me that he had stated that he wanted me on the 6th floor to get me out of the 17th floor office. I worked in this area for the period of 12/21/15 through 12/18/16.

9.  I was working with Mr. Alfaro, helping him with his staff issues. Mr. Alfaro would blame all the problems with the VAB on his Court Operations Officer (OIC), Pamela Lawson-Schwalm. She would come to work one (1) to two (2) times a week. She should have informed Mr. Alfaro whether she was coming to work, but she never did. Mr. Alfaro decided to use me to help him with the office personnel.

10. In February 2017, after Mrs. Lawson-Schwalm retired, I was interviewed and hired for the OIC position in the VAB.

11. I started to make changes in the office with Mr. Alfaro's approval. I cleaned up the mess that was in the office and began to cross-train employees. During this period, I was informed of comments that Mr. Alfaro made about me to the clerks in the office. Things worsened for me after I was promoted to the OIC position.

12. In June 2017, Mr. Gonzalez and I attended and helped set up Mr. Ruvin's 80th birthday party at Mrs. Ruvin's request. It would first be at Mr. Ruvin's friends' home, but the party was changed to the Four Seasons Hotel due to the weather. The location was rented out by Mr. SM, who lives in a penthouse in the four-season hotel. At this event, Mr. Gonzalez and Mr. Henderson shared the food (paella) cost and alcohol. Mr. Gonzalez paid for the band that played at this event. During this event, while speaking with Mr. Henderson, I asked him if I could be moved from the VAB, and he told me that, in the meantime, I couldn't be moved until the new computer system was up and running. He told me how I could move up the ladder because of my years of seniority and work ethic. He then said to me that "the only reason KF was where she was at was because he was fucking her." He also told me that she would have never been able to move up the ladder if it wasn't for him. Mr. Henderson said KF was crazy, and she got lucky because of him. I just told him TMI (too much information), made an excuse, and walked away. I did not inform Mr. Gonzalez then and waited until the next day to tell him what Mr. Henderson had said. I tried to avoid any scenes or confrontations at this party.

13. On November 2, 2017, an incident occurred with the Lead Worker, SA, where he took it upon himself to find a magistrate to cover a hearing due to an error made by the scheduling clerk, MDLC. While the supervisors and I were seeking coverage, SA arranged for a magistrate to cover a hearing without consulting the supervisors or myself. After one of the supervisors and I spoke to him telling this employee he had to go to the chain of command, he told the scheduling clerk he would do it again. I told Mr. Alfaro about this situation and how SA bypassed me. SA knew he was in a meeting and called to inform him about the situation. Mr. Alfaro told me that SA had texted and not spoken to him. The following day, during a supervisor's meeting, Mr. Alfaro brought up the issue that had occurred with SA. Mr. Alfaro stated the day before, he had spoken with SA and told me that he had spoken with him about the situation. Mr. Alfaro said he had

informed him to handle the situation. He said he didn't want the supervisors or me speaking again with either employee, MDLC, or SA. Mr. Alfaro covered up and supported SA's behavior.

On this same day, I called the VAB Attorney, Mr. RM, into my office to discuss a situation we were having with the Magistrate's rulings not being able to print. He talked out loud, saying he would blast the computer guys out of the water. When Mr. Alfaro returned to the office, both Mr. RM and I went to talk to Mr. Alfaro.  In this conversation, Mr. RM started to shout that he knew the computer guys were working on other projects and would blow them out of the water.  He went on to say that if they thought they had a big dick, he said he had an even bigger one making a hand gesture like unfolding in his genital area. I was shocked that he said and did that gesture.

14. On November 6, 2017, LG, a VAB employee, approached me to tell me about an incident with her duties.  She told me that SA had told her that Mr. Alfaro was waiting to burn CA (VAB Supervisor) and me with her functions. SA was telling LG to follow other procedures that were not in place, and she said she was doing as her superiors had informed her.  This was when he told her about Mr. Alfaro wanting to burn the supervisor and me. LG told me she did not find this situation correct because the VAB Manager told an employee what he wanted to do with her supervisor and OIC. I spoke with Mr. Alfaro about LG's comments later that day, and I could tell by his body language that he did make those comments to SA. After working hours, I went to see Mr. Martinez and asked Mr. Martinez to be moved or transferred from the VAB. He informed me he could not do that and that I had to make it work.  He told me he liked the combination of Mr. Alfaro and myself as management because of what one lacks; the other made up for it, and it was two management styles. I told Mr. Martinez that Mr. Alfaro was undermining my authority.  I told him how I would make decisions, and he would tell the employees to do it another way. I told Mr. Martinez how LG, a VAB employee, told me how Mr. Alfaro was close with SA and how he included and informed SA of everything happening in the office and excluded me. I told Mr. Martinez how Mr. Alfaro took the time to train and advise SA on how to do things in the office, but he never included me or taught me anything related to the VAB.  I informed him that everyone in the office knew Mr. Alfaro didn't want me as his assistant and preferred SA. Mr. Martinez refused to move me.

15. On January 24, 2018, an incident occurred with another VAB Employee, LH.  LH was away from the front counter where she was supposed to work. After researching her whereabouts, LH lied to the supervisor and me about her location.  She had altered her time on the sign-in sheet and took longer than allotted for her break. After speaking with Mr. Alfaro several times about the incident, he confirmed that LH's story was a lie.  He first told us to deduct her time, and then he told us to give her back the time after he had confirmed she was not at the location she had told us and had lied to all of us. Later, on February 1, 2018, Mr. Alfaro wanted me to talk to LH to hash things out; I advised him I didn't need to do this because I was not lying to my supervisor, and it should be the other way around. He later told me I didn't need to speak with her.

16. On January 29, 2018, CA, VAB Supervisor, told me about a conversation with YF, a code enforcement employee.  Ms. YF had advised her that she and SA had broken up, and she was upset because his new girlfriend kept coming to our office, and she felt disrespected. She also informed her that if this continued, Ms. YF would come to see me about the situation. When Ms. YF started to date Mr. SA, she had gone to the previous OIC and said she wanted to be respected by the men in the office.  CA said that the former OIC had told Ms. YF that she had put herself in this position.  CA said to me that in the VAB, it was known that people would get involved with each other. She said it was common for Ms. YF because she was "Caliente," meaning she was very sexual. CA told Ms. YF that she was always flirting with her supervisor, FG, who is also Mr. Alfaro's brother-in-law and Mr. Alfaro. I informed her that an employee had already

3

commented on all the sexual innuendos in the office, and CA said that has always been the behavior in the office. CA told me about an affair that Mr. Alfaro had with a former employee in the office, where he was going to leave his wife for the employee.

17. During a VAB staff meeting on January 31, 2018, Mr. Alfaro referred to SA, Lead Worker, as his right-hand man.

18. On February 1, 2018, OA, a VAB employee, told me she was sick with what was happening in our office. She said that Mr. Alfaro wanted our office to be a party always, and it was like a fraternity. She told me that employee YF had said she was upset because he had been bringing his new girlfriend to our office since she and SA broke up. YF warned SA that she would tell me of the situation if he continued to bring his new girlfriend to our office. YF had warned SA about this situation before Mr. Alfaro, and he told Mr. SA to be careful. YF had stated that this was disrespectful to her because SA was bringing the new girlfriend into the conference room where they (SA and YF) used to have inappropriate behavior in (sex). YF told her that she received a phone call from SA's new girlfriend, and she told YF all her intimate problems with her daughter that SA had told her. I advised OA that I knew the situation with SA's new girlfriend and would address her concerns. She said that she felt that this office was not professional and that it started with the top. She was insinuating that Mr. Alfaro was not professional. She said she does not trust him and that he is the one who encourages Mr. SA and his pals to behave the way they do. She went on to tell me about a situation she had when she was first hired with the VAB. She was sitting at her desk behind the partition where the water cooler was located; she saw YF touching Mr. Alfaro's parts, and he told her (OA) to look out for him. She said that since she was new to the office, she left the area because she did not want to be part of any of this situation. She went on to tell me that this was common in the office and that everyone was aware of this situation.

She continued telling me that when she had lunch in the breakroom, she could hear moaning from the conference room. OA said that when she asked one of the temp workers (Jeremy, Code Enforcement) where that noise was coming from, he said it was expected because that was the room they used for inappropriate behavior (sex). Everyone knows what goes on in that room. OA noted that she had heard these moans about three times while in the breakroom. She said she feels uncomfortable in this office.

In the afternoon of this same day, I talked to Mr. Alfaro about Ms. OA's concerns. When I arrived at his office, he was not there. I looked around and noticed several employees were missing from the office. I asked two VAB employees where Mr. Alfaro was, and they informed me that several employees were in the conference room with Mr. Alfaro in a meeting. After reviewing the cameras, I noticed several employees entering the conference room with Mr. Alfaro. I could not talk to Mr. Alfaro on this day, and he was leaving on vacation. Since I could not talk to him, I texted Mr. Martinez and asked if I could speak with him.

19. I saw Mr. Martinez at his office on February 5, 2018. On this day, I informed him of several issues that were going on in the VAB. I told him of the conversation with OA and how she felt working in the VAB. I told him about the conference room, what Ms. YF told her, and how she would hear noises from the conference room while she was at lunch. I also informed him of the situation that had occurred with LH. Mr. Martinez told me I was more concerned with LH's situation than the conference room situation. He said I was also liable for that situation with the conference room. I told him I was doing something about it, and it was informing him of the problem. It was in his hands now. He said that LH, was grounds for firing because she was altering the time she used. He told me she should be written up. I told him I wanted to, but Mr. Alfaro saw it differently. I asked Mr. Martinez to be moved from the VAB, and he told me there was nowhere

4

I could go because there was no opening; he also thought that Mr. Alfaro and I were an excellent management combination and would not move me.

20. February 13, 2018, I met up with Hobart M. Henderson, a/k/a Mike Henderson, COC Chief of Staff.  During my lunch meeting with Mr. Henderson, I told him about the VAB situation and how Mr. Alfaro treated me. I went over how he undermines my authority, only acknowledges the lead worker, SA, and does not include me in any of the Property Appraiser's office meetings or any decision-making in the VAB.  I also told him how the office was a boy's club. Mr. Henderson said that my problem was that I made too much noise.  I asked why he told me this, and he said I reported the conference room situation.  I told him I was doing my job and trying to make sure Mr. Ruvin didn't have any scandals because of the behavior of the VAB men. I told him now I know better not to report anything again. I asked him if I could be moved from the VAB, and he told me he couldn't until the new computer system was up and running. I left this meeting very disappointed because I would not be moved from the VAB.

21. On February 26, 2018, Mr. Alfaro came to my office with the excuse to talk to me about the funeral I had gone to the day before.  I found it strange because he did not know the person who had passed away, but then suddenly, he began to ask me about my time.  He said I had told him I needed to burn some hours I would lose. He said he looked at my time, and it did not show that I was losing time.  I knew he was questioning my time.  I had to sign into my paycheck and show him the message at the bottom stating I needed to use my time; if not, I would lose it. I had to explain how the conversion time worked because he did not know how I could lose hours. He was questioning my time.

22. On March 8, 2018, I informed Mr. Alfaro about our situation with two Magistrates needing to complete their boards.  He told me to let the scheduling clerk wait to schedule them for hearings until they caught up with their boards.  I told MDLC not to schedule them and to send them an email advising them of this, as we did the year before.  After I left, Mr. Alfaro called MDLC to his office and told her not to send the email because he handles things differently, has been there longer, and knows what to expect from the magistrates.  He told her he would call and advise me, which he did, and I reminded him that we handled this situation the previous year by emailing them. Again, he undermined my authority by changing my directive to the clerk.

23. On March 12, 2018, I called Mr. Alfaro to inform him that the new employee was in my office. Ms. Soto advised me that Mr. Alfaro was meeting with Mr. RM.  Mr. Alfaro called me to let me know he was in a meeting.  I informed him that the new clerk was in my office.  I found out he was meeting with the VAB Attorney and one of my supervisors because another clerk called me and advised me of the meeting being conducted without my presence. None of the participants in that meeting advised me of the situation going on in the office.

24. On March 22, 2018, I gave Mr. Alfaro a fax received in the office. He began to provide me with instructions on what to tell the taxpayer.  I told Mr. Alfaro that it sounded like I would give him legal advice.  Mr. Alfaro said it was not because he knew the reasons why. I told him the explanation he was giving me to say to the taxpayer was like going into the magistrate's thoughts or head and giving the findings or ruling that the magistrate did. He told me he always did it this way. I told him I would explain, but it went beyond the ministerial scope.  I called the taxpayer and provided the information Mr. Alfaro told me to tell him.  While talking to the taxpayer, Mr. Alfaro walked in and listened to my conversation. The taxpayer asked questions that should have been answered by the Property Appraiser Office (PAO). Still, Mr. Alfaro kept giving me answers to provide the taxpayer that the PAO should have provided.

25. On March 26, 2018, Mr. Alfaro wanted to talk to me about my conversation with the taxpayer on March 22, 2018. He said he wanted me to feel comfortable giving answers to taxpayers. I told him I didn't have a problem giving them answers to their questions but that the answer he told me to share was legal advice. He said it was not, and I advised him it was. I had worked in other areas of the clerk's office, and what he was saying was legal advice. I even told him about an email I had to talk to SA about that was legal advice, which was also in writing. Mr. Alfaro said he only allows certain people to answer questions like that, and SA is one of those people. I told him I would follow his instructions, but I used my own words so it would not sound like I was giving legal advice.

26. On May 2, 2018, I called Mr. Alfaro and was informed that he was in a meeting. I also called to speak with SA and was informed he was meeting with Mr. Alfaro and Mr. RM. I was not informed of the meeting, nor was I told to attend the meeting, but the lead worker was there.

27. On May 7, 2018, I told Mr. Alfaro of discrepancies I found with the reconsideration process. I told him that Mr. SN was bypassing a step in the multi-parcel process which could lead to misunderstanding. Mr. SN was typing in "change" or 'No change' on the first parcel; if it had more than ten (10) parcels, he would refer the remaining properties to the first parcel. Under ten (10) parcels he would type in every parcel change or no change. This would show up on the reconsideration report as pending parcels. Mr. Alfaro told me to ask him why he was not entering these dates. I asked Mr. SN why he was not entering these dates on the reconsiderations. He told me I work smarter, not harder. I told him that on the reconsideration report, it would show up as pending. I asked him if he had talked to his supervisor about doing this, and he said no. I told him he could not change the procedures in place.

28. On May 8, 2018, I told Mr. Alfaro I would help Mr. SN to catch up on his work. After speaking with all three employees, I talked to Mr. Alfaro about what had happened. Mr. Alfaro told me in a lecture voice not to take it negatively and that I should not negatively see this situation. I told him I was putting him on notice that this situation was happening, and he told me the word "notice" was offensive to him. I told him to take that word back and put it a little more delicate for you. I told him, "I am informing you, "since he was the boss and needed to know. He told me I didn't have to worry about this. He said he knew the agents, and they know better. I told him if he was okay with it, it was not a problem. It was in his hands. He was covering up for Mr. SN, who was in his group.

29. On May 22, 2018, I ran into Mr. Martinez on the street. He had asked me how things were going, and I told him everything was good, and we would certify the tax roll the next day. Mr. Martinez said we were not going to certify and said don't you know? I told him no, what are you referring to? He said there were three (3) pending properties. I told him I made sure everything was closed. He began to inform me about a lawsuit that was filed against the VAB. I told him I knew nothing about any case, but it did explain why the men in the office were looking for a video of the attorney filing the lawsuit who did a headstand on top of the table in a hearing room. He said that it was not right that I did not know. I told him I was not a man. He looked surprised and said what do you mean? I said I was not part of the boy's club. He then proceeded to tell me about the lawsuit and ignored my comment.

30. On May 24, 2018, I texted Mr. Alfaro while I was coming into work to let him know that I was leaving at 9:00 AM because I had to take my mom to the doctor. He texted back and said it was "ok." When I arrived at work, I put in my time on the ePar as 1 Regular time and 7 Annual. When I was leaving, I called Mr. Alfaro to advise him that I was going. He said ok, no problem. As I walked towards the parking lot, I received a call from Mr. Alfaro. He asked me if I was going

to return to work. I told him, "No, because I had to take my mom to her doctor and take her back home, so it's not worth me driving back and forth." He said he didn't know I would leave for the rest of the day. I asked him if he needed me for something, and he said, "no." Then he asked me why I came to work at all. I told him that I was near the downtown area when I received the call from my mother's doctor, and I was already in the area, so I might as well come in. He said OK and good luck with everything. I said fine. I felt as if I was being questioned as to why I was not returning and was questioning my time.

I returned to work at 2:35 p.m. and posted my time again on the ePar. I texted Mr. Alfaro that I was in the office, and then he called asking why I returned. I didn't respond to his question.

He asked me why I returned to the office. I told him I wanted to talk to him in private in our conference room. When in the conference room, I told him I came back to talk to him because I was really upset because he called to question my time. I told him this was the second time he asked me about my time. The first time was when I told him I needed a Friday off and I needed to burn some time, and the following Monday, after I came to work, he came to my office and questioned the time that I had to burn. He said that I had to sign into my paystub and show him the message at the bottom, and then I had to sign into my information to show him the message I received. (SEE NOTES FROM FEBRUARY 26, 2018). I then told him considering that I have always requested my time in advance, and I never call out sick, and when compared to his previous OIC, I am here, I felt that he should not be questioning my requests. He said that he was not questioning my request. I told him that I thought that he was. He then told me he couldn't help my feelings, which was not his intention. *(An employee had texted me that he was discussing with one of the supervisors, CA, about me leaving early. I did not mention that I knew he was because I wanted to protect the employee. The employee stated in the text, "I don't want to add fuel to the fire, but Mr. Alfaro is talking to CA about you. He began by saying I didn't know she was leaving early, but then CA got closer to whisper. He moved from a certain area of his office so she could not hear what they were saying.")*

I told him that he needed to understand that he had previously questioned my time and that I knew he couldn't do anything about how I felt, but because I am always here and have my time preapproved, I shouldn't be questioned. He said that with the burning my time situation, he was trying to find out how that worked. I told him that was not what I felt. He said again I cannot control how you feel. I told him he was questioning whether I had lied about burning time. I went over what took place on that day, and when I received the call earlier today, it felt like he was questioning again. He then said that was not his intention. I told him OK, but now that we are here, I might as well get some things out in the open. I told him about how he undermines my authority. I gave him several examples (LH and the way he handled the situation, SA being his right hand, DT going to him to get TC to help, and him knowing she was assigned to work at Code Enforcement and also how Mr. Martinez told me that there was an ongoing lawsuit and everyone knew except me, How I am not known in the PA's Office and everything goes to SA, How RM bypasses me and informs SA, SN and the employees of things and I am not informed of anything.) At one point, he said he did not like me using the word "Undermine," and I told him that it is precisely what he does; he said he doesn't that he does not do this on purpose. Then I told him that if I say to him of things, it is because I am being informed of things.

After all, my job is to ensure he knows what is happening in the office. I went over the SN situation and how he tried to make excuses for bypassing steps in the reconsiderations. I told him that I try to prevent problems in the future and try to prevent them as they are happening.

7

I also told him about how he wants to work on the morale in the office, and I said to him that since I stepped into this office, he has been the one who divides the office because he held a meeting on the 6th floor the first week I was here and he told all his employees to be careful with me because I report to Mr. Martinez. He acted like he didn't do this, but I told him I was fully aware what he did on the 6th floor, warning the employees not to disappear. He didn't say anything about that situation. I told him that I have tried hard to work with him, like when I tell him things that may affect him. I gave him an example of what the women say about DN and him in the office. They say she is always in his office talking to him. He said people call him to tell him that OA is always gossiping in my office. I told him yes, OA comes to my office, and we don't talk low, and she is telling me things that happened in the Recorder's Office while I was there that I did not know occurred. I told him the difference was that people can say I gossip with OA, but they are not insinuating that I like her, unlike him. I told him I'm letting him know. He said he doesn't like it when I say it to him that way. I told him I was doing my job, and that whether he allowed her in his office was up to him. I told him I was doing my job by letting him know, and as to OA coming to my office, that would stop from today. He said he didn't care if she was talking to me, and I said no, it stops here because I don't want anyone to feel bad. He then said he could care less what people say, and I told him I am the same way, but our job is not to make anyone feel bad. I then told him a perfect example of things he says and does that he doesn't realize how they affect people is when he complements people in meetings and forgets to complement the ones that do the work. I gave him the example of the meeting we had after the certification and how he complimented RN and not NO, OA, or MDLC. I told him I had to mention it because they are the ones who are doing the work in the office. He said that if people feel like they need to complement, they are "acomplejados" meaning "complexed," and he is not here to make them feel good. I told him it does affect the people who work because if they see that he complements those who don't do the bulk of the work, then they will start to slack, and in the end, he is the one who will be affected by this. He said he counts on us to fill him in because he does not know.

I then told him about CA and her comments to an employee about me. I told him I was very disappointed with her because she told an employee that she didn't understand why I was so hard on my people with the time, and that was why she always bypassed me and went directly to him. He said they are used to doing this because Pam Lawhorn-Schwalm was never here, and she would go directly to him. I told him that was not proper because we have covered this subject in many meetings, and it is clear about the chain of command, especially CA, who has made comments to me in the past, how they bypassed her, and that was not proper. I told him I would eventually talk to her when I was ready, but she told the employee that it was OK to bypass me altogether and go directly to him. I also told him about the employee's time. She should not be discussing time because I have worked with her many times, and she does not know why I tell her to monitor a person's sick. I told him if I allowed an employee to use their sick time all the time, I would have to let the other employees do the same. He told me that I needed to talk to her. I told him I would and that she would probably come to him to let him know. I also told him she told the employee he had more experience than me. Still, I said to him that it was true he had more experience working in the VAB, but I have way more experience than him in other areas and supervising because I have been in many areas of the Clerk's Office.

We ended this conversation by telling him that I don't know whether I would be working here for the next 2 ½ years that I have left to retire, but that I want to be in peace if I stay here. *(I was not planning on retiring but told him this so he wouldn't make my work life as miserable as he was.)* I am here to let him know how I feel so we can work together. He said fine and

8

that he was mainly concerned that I believed him and that he was not questioning my time. I told him okay, but he needed to understand that the first time he came to me with burning my time issue, it made me question his intent that day.

31. In June 2018, I attended Mr. Ruvin's 80th Birthday party. This party was held at the Four-Season Hotel because SM owned a penthouse and paid for this ballroom for this event *(My ex-boyfriend told me this information)*. I helped set up the party with my then-boyfriend, Antonio Gonzalez. My ex and Mr. Henderson paid for the food and drinks for this event, and my ex also paid for the band playing the music. At one point, I was talking to Mr. Henderson, and he was talking about how I had the potential to move up in the Clerk's Office. He said I had the seniority and the years of experience to become the manager of Code Enforcement. He then proceeded to tell me about KF. He said she was crazy, but the only reason she was where she was in the Clerk's Office was because he was "fucking her." When he told me this, I felt like he was insinuating if I slept with him, I would be promoted. My only response to him was, "TMI." I then made an excuse to find my boyfriend and walked away. I did not mention anything to my boyfriend until the following day. I did not want to create a scene at this party.

32. On August 10, 2018, I spoke to Mr. Alfaro about Mr. SN's comp time. I told him I was concerned that he would be out for 2 ½ days and would show up as working in the office. I told him that the union contract states the employees are to get paid and not get comp time. He said he had spoken to Mr. Martinez a couple of years ago. I told him if Mr. Martinez is aware of this and he approved it I don't have a problem. I was the one supporting the time for all the employees.

33. On November 7, 2018, I called Mr. Alfaro to inform him of my situation with accounts payable. Mr. Alfaro was not at work, and I called Mr. Martinez to advise him of the situation just in case he received a call from the director from that office. Mr. Alfaro got upset because I told Mr. Martinez. He asked me why I called Mr. Martinez. He said I did not have to call him; I told him just in case he got a call from the director of that area.

34. On December 17, 2018, OA showed me a set of questions used at the VAB and COE Christmas party. She said that they were left on a desk in the office. She told me that LH left this on LS's desk since she used his desk to use Microsoft Word. I read the questions that were sexually oriented, and I asked her if she knew if this was asked at the party since I did not go. OA said she didn't know because she and the people she talked to did not attend the party either. I told her I could not confirm whether these questions were asked. Later in the morning, MDLC asked me if I went to the party, and I told her I did not. She said they were talking in her area and had a lot of fun, except for SA, who said he did not care for the game with the questions asked. MDLC said that CA had mentioned that the party began when Mr. Alfaro joined the table to dance.

I decided not to say anything about these questions to Mr. Martinez since the last time I brought up the issue of the Conference Room being used as a sex room by SA and YF, nothing came of it. I also decided not to discuss this with Mr. Martinez since I spoke with Mr. Mike Henderson, and he had mentioned that I make too much noise, meaning bringing up the Sex Room. When Mr. Henderson told me this, I informed him that I only make noise to avoid exposing the Clerk to a potential media problem, but now I know better. I also had my reason not to say anything because, according to Mr. Martinez, I must take it easy, as he told Tony Gonzalez about me. In addition, I could not verify that the questions were asked and answered

at this party since the people who attended tended to avoid me, and they were Mr. Alfaro's crew. However, OA told me she had taken a picture of the questions just in case.

35. On January 8, 2019, I observed Mr. Alfaro and the VAB Attorney going into the conference several times today. MDLC told me something big was happening because Mr. Martinez kept calling the office. Mr. Alfaro keeps going into the conference room to speak with him. She said that, as always, they keep me in the dark. She said that he has told CA everything that is happening and that SA also knows.

36. On February 12, 2019, Mr. Alfaro told me that people in the office were saying that I was disrespectful to him while he was being presented an award by his employees the day before. I asked him why. He said that I talked throughout the presentation when Mr. Ruvin, Mr. Martinez, and he were talking. I told him to please tell those people to see me if they have a problem. I told him that Mr. Henderson was the one who was talking to me and asked if they wanted me to tell Mr. Henderson to shut up. I told him it was Mr. RM. He said he was the one who had mentioned it to him. I told him to ask him to talk to me.

37. On February 13, 2019, I texted Mr. Henderson to call me when he had a chance, and he called me to have lunch with him that day. While I was with Mr. Henderson, I informed him how Mr. Alfaro had mentioned that I was disrespectful to him because we had been talking during the presentation. He asked what he wanted me to tell him to shut up. I told him that I had told him that exactly. I told Mr. Henderson how Mr. Alfaro is constantly being disrespectful to me. I asked again to be moved, and Mr. Henderson said I was getting paid to do a job. He then told me that the office was questioning my loyalty. He then corrected himself and said he was questioning my loyalty. I asked him why. He said because he did and didn't give me a straight answer. I just told him my loyalty is to the citizens of Dade County. I ended the conversation and told him I had to return to the office. I left upset because I knew Mr. Henderson was behind me, not getting transferred from the VAB.

      Later that day, Mr. Alfaro called all the employees to CA's desk area to sing Happy Birthday to her. He called everyone except for OA and me. This is the second time he has excluded me from one of the supervisor's birthdays.

      At around 4:00 pm, I saw the supervisors from the PA's Office waiting outside our office (Jason and Manny Pernas). Mr. Pernas asked me if I was invited to the meeting in our office and I told him when I am ever invited to any of the meetings. He said I should be included, and I said this is how our office works.

38. Sometime between February and March, I don't remember the exact date I had seen Mr. Alfaro because NO received a call from the Department of Ethics. She had informed me that they were questioning the Christmas Party. I told him I noticed several employees disappearing and the employees gathering up and talking low. I felt like something was happening, and I needed to know because of the call No received. He said he could not tell me anything because Mark told him he could not inform me. I told him I would call Mark because I needed to know what was happening in the office. I told him I was never informed of anything. He said he would call Mr. Martinez and tell him what I said. I told him, please get in touch with him and tell him. I got a call from Mr. Martinez to see him at his office. When I arrived, the HR Manager, Bibiana Candame, and Mark Martinez were waiting for me in the office. I told him I was worried because the Commission on Ethics (COE) was inquiring about an investigation of sexually oriented questions written at the VAB for the 2018 Christmas Party. Mr. Martinez began by asking me if

I knew what happened at the party, and I told him I did not know because I did not attend the Christmas Party and was out of town. I also told him they (Mr. Alfaro and his buddies) would not want me to be there either. They asked me about the questions, and I said to them that OA had shown them to me as they were left on an employee's desk. I told them I didn't remember the questions, but one was very explicit, and I am happy I did not go to the party.  He asked me if I believed that these questions were asked.  I told them that MDLC told me that SA was talking about the party and said he had fun except for the game with the questions.  I also told them that she mentioned that CA said that Mr. Alfaro got on top of the table and started to dance.  I told them I didn't believe or hope he would not do that in a restaurant. I told them I did not advise Mr. Martinez of these questions because of the comment that Mr. Henderson had told me I made too much noise for reporting the conference room. I also told them I had asked him to be moved from the VAB because of how I was treated. I told the HR Manager that the office was like a boy's club and their behavior was not appropriate for the office.  Mr. Martinez asked me if I believed they gave these questions at the party.  I told them it would not surprise me if they did. I took advantage of having Mr. Martinez and Ms. Candame present to ask them about employees working comp time.  They both said comp time was not allowed and should not be given. At this meeting, I also advised Mr. Martinez and Mrs. Candame that I had to be moved from the VAB.

39. On March 1, 2019, LH had a Luncheon at the office, and I was not included nor advised that there was a lunch. Everyone was aware except for me. I was made aware of this after the luncheon took place.  Mr. Alfaro and everyone else knew about it and never informed me before or after the luncheon.  NO advised me that they blamed her for not telling me about the luncheon.  She said that LH told her to tell OA, but never mentioned to tell me. She said that they were trying to blame her for not mentioning it to me. I was also made aware by MDLC that LH just planned this, and that Mr. Alfaro had been aware of the situation since the morning.  LH did not ask for permission to have this luncheon.

40. On March 6, 2019, Mr. Ruvin called me to see him at his office. He told me he wanted to help me out. I informed him how I was treated and felt working at the VAB. He said he knew I was applying outside the Clerk's Office, and he even mentioned a position I was being considered for with the Administrative Office of the Courts. He told me he would help me get another job in the County. I told the Clerk he could transfer me and move me to another area of the office, seeing that I had over 28 years with the Clerk's Office. The only reason I was applying to other areas of the County was that they needed to allow me to be transferred or even allowed to be promoted within the office. I told him I was seeking employment outside of the VAB because of how Mr. Alfaro treated me and how he put the employees against me. Mr. Ruvin began to tell me how Mr. Alfaro was almost fired for his incompetency in not certifying the tax rolls on time.  He said he gave one more chance to do his job. He said he knew the VAB situation and would like to help me get a job in the county. I told him I appreciated his offer. However, he had the power to move me to another area. He again said I should let him know where I was applying; he would help me get the job with the County. He said that he knew my work ethic and knew I was a hard worker and a loyal employee.

41. On April 4, 2019, we had a situation with the interview for the County Commission Clerk 2 position. In these interviews, I was sitting and observing the supervisors. At the end of the interviews, CA stated that she rated one of the interviewees higher because she knew how she worked and did not base her ratings on the questions asked. The person who interviewed did poorly in the interview but was rated higher than the rest of the people who interviewed.  The

11

other situation was when one of the interviewed employees said he had autism. The person never divulged or stated that he was autistic. After the interviews, Mr. Alfaro asked me how CA did in the interviews. I advised him that she did well but admitted to rating someone higher not because of how the person answered but because she knew the person. I told him that I explained to the supervisor she had to rate the answers rather than on her knowledge of the person. I told him that she had rated this person way higher than her performance in the interview, and she got the edge over the rest of the interviewed people.

42. On April 8, 2019, Mr. Alfaro asked to meet about the interviews. He told me if the person believed to have autism stated that he had autism. I told him no, and he never disclosed that. The only person who commented before he was interviewed was one of the supervisors who said the person was not tightly wrapped. Mr. Alfaro was worried about this person not being hired because of ADA, and he may have autism. I told him that the person seemed bright. His answers were a little lengthy, but he answered the questions. I also went over the scoring situation with the other supervisor, but he said he was going to talk to Mr. Martinez about the one thought may have autism.

43. On April 11, 2019, I was cleaning my office early in the morning. At around 10:29 a.m., Mr. Alfaro was saying in a very loud voice that he needed a calculator. He came into my office and told me to open my cabinets to see if I had any calculators. I told him I just cleaned those cabinets, and I didn't have anything in there. He told me I had to open those cabinets up. I opened them up, and nothing was there, as I had told him. Before he left, I told him to take my calculator that was at the front desk, and he could use it. He went directly from my office and did not take the calculator. The way he was talking to me was apparent. He wanted to see inside my cabinets as if I was hiding or doing something. I believe CA must have told him I was cleaning or doing something early in the morning. I felt as if he was checking up on me.

44. On April 18, 2019, Mr. Alfaro called for a supervisor's meeting in reference to the interviews. He said that he had gone over the interviews the days before, and since I was not there, he wanted to discuss two issues. The first one was that they went over the employee who was scored higher, and he was going to offer her and another person the job. He told me to review the evaluations, and I told him it was not necessary since they already decided to give the person the job. He then asked me how CA did in the interviews, and I told him, except that she gave one of the interviews the edge, that she did fine.

45. On April 24, 2019, I asked Mr. Alfaro if we had to go to the Family Building to meet up with Mr. Martinez. I told him that a supervisor told me the meeting would be there. He never informed me that we had to meet Mr. Martinez in his conference room at the Family Building to discuss the Christmas questions. I told him that the Fair Employment Office investigator asked me questions. He asked me to tell him what he asked, and I told him he said not to discuss it. I did tell him I had to refer to my notes from the interviews from the year before.

46. On April 25, 2019, we met with Mrs. Candame and Mr. Martinez about the outcome of the investigation of the Christmas Party. In this meeting, the employees and Mr. Alfaro were trying to insinuate that the questions found for the Christmas Party were given to the actual board members by an employee. I found out in this meeting that a Magistrate wrote a letter or email that was sent to the Board about the party.

47. On April 30, 2019, I tried to reach Mr. Alfaro when I was informed, he was meeting with the Senior Deputy, Mr. Martinez. I was surprised to find out he had left the office. The employees knew where he was, but he never told me. Later that day, at our staff meeting he informed the

unit that SA had attended a meeting with the building manager and got all the updates for the building. I was unaware of this meeting and found out when the staff meeting was held.

48. On June 20, 2019, NO told me that sometime in January, Mr. Alfaro had called her into his office to talk to her about OA, EC, and me. She said he asked her if I had ever offended or been rude. She said she told him no. She said he continued to say that he cared about her, and she was surrounded by very bad people who would backstab her. She said she has never had any problems with any of us. He said that if they were to be rude or offend her, she only needed to come and tell him. She said fine. NO said she knew he was up to something when he called her to talk to her.

49. On June 25, 2019, Mr. Alfaro had a meeting with Pioneer, and he did not advise me of the meeting. When I walked a representative of Pioneer to the training room, I saw SA in the room. He was participating in the meeting. Mr. Alfaro did not bother to introduce me to anyone in the room. Mr. Martinez showed up to talk to both Mr. Alfaro and me, and I walked him to where Mr. Alfaro was having the meeting. Mr. Martinez wanted to speak to both of us to update us on the situation with Code Enforcement. He is aware that I am not part of this meeting.

50. On August 15, 2019, we had the yearly meeting on assigning the employees to the next tax year's assignments. We discussed all the positions, which included the scheduling of Special Magistrates. Mr. Alfaro and CA wanted to assign SN to that position. I inquired as to whether we were going to interview or assign a person. Mr. Alfaro said he was going to assign. After every position had been assigned to an employee, Mr. Alfaro asked if there was anything else with these assignments. I again stated that the only problem I saw was that the employees might get upset with a lead-worker position being assigned and not being allowed to interview for the 5% increase in salary. Everyone stayed quiet.

In addition, while we were assigning employees, they (Mr. Alfaro, CA, and DR) mentioned that we would have a problem since TC wouldn't be here during December. I asked if she was going on vacation. All three looked at me, and Mr. Alfaro said don't you know? I said I had no idea what you guys were talking about. He said she is pregnant. I told him no; I didn't know she was pregnant because no one told me anything. DR then said can you tell? I told him no; I don't look at people and check them out. I said no one informed me that she was pregnant.

51. On August 16, 2019, Mr. Alfaro asked me that if I had discussed with anyone the work assignments. I told him no one speaks to me. He said that SA overheard people talking about the assignments. I told him it wasn't me because people don't talk to me, so I don't talk to them. I talk to the employees through the supervisors. I told him it may have been DR since he talks to the employees.

52. On August 17, 2019, MDLC filed a complaint with Mr. Martinez, informing him of the situation within the VAB. Mr. Gonzalez hired her as his secretary, and she felt she needed to tell Mr. Martinez what she went through while working at the VAB. This letter states how Mr. Alfaro would speak poorly of me with my subordinates. This letter also started an investigation that I never knew took place.

53. On September 5, 2019, I ran into LG, a VAB employee, in front of the DCC Building and asked why she was leaving that building. She told me she thought I knew where she was working. I told her I was under the impression that she was still over at Juvenile Court. She said that she was sent over last week and that she has been working in Mental Health looking and searching for

orders that were not sent to FDLE and people who could not own guns. She said that she had found a lot of errors, and she also said that the employees told her to slow down because she worked too fast and then they would not get overtime. I told her that explained her overtime slips that I had to approve on ePar.

Earlier this same day, I had asked both CA and Mr. Alfaro why Liliana was getting paid overtime. CA said Mr. Alfaro told her to post that over time. She said she didn't know why. I then asked Mr. Alfaro, since I was approving her time, why she was getting overtime. He said he didn't know but that Doreen Ruggiero told him she was doing overtime. They knew she was working with the Family Division, and I was not informed. LG confirmed this information.

Later that day, Mr. Alfaro called the two supervisors and me to his office. He advised us that he got the approval to fill the positions. He then said he got the floats for the registers and that we would send LS to the South Dade Branch. After we all discussed of the filing period, he said he was going to call Ghislane Johnson to see if either FG or AC could sit in the interviews. He was telling me without telling me directly that I would not be part of the interviews as all the other OIC's in the Clerk's office conduct the interviews. This will be the second time he has not put me on a panel for interviews.

54. On September 6, 2019, Mr. Alfaro informed me that the County Commission Clerk 2 interviews will be held on September 24, 2019, at 9:00 a.m. I asked who would be on the panel, and he said CA, DR, and he wanted AC from Code Enforcement. I asked if I would be present, and he said, "NO."

55. On September 9, 2019, Mr. Alfaro called me to ask if he had told us the interview dates. I told him he told us the interviews would be held on September 24, 2019. He said let me call AC (Code Enforcement) to let her know the date. He was letting me know the date and that I would not participate in these interviews.

56. On September 16, 2019, NO returned from FMLA, and she asked me if I wanted her to forward an email she received about the Cashiering Manual. I told her to please do so and thanked her for keeping current. I later forwarded an email to DR after reviewing that neither he nor I was on the email. However, I noticed that Mr. Alfaro and CA were copied on the email, and neither bothered to inform DR or me.

57. On September 18, 2019, at around 8:15 a.m., I saw all the employees walking into my office, and I asked them what was going on since everyone was coming into my office. DT said that CA said we were having a meeting. I was not aware of any meeting. She said that Mr. Alfaro told CA he was having a meeting. I asked her if she knew what the subject was about. She said CA knew. DR came into my office and asked what the meeting was about. I told him I didn't know. He then turned to Mr. Alfaro and asked him, and he said he would find out soon. Mr. Alfaro went on to talk about the day after filings and what the employees need to do. After he relayed his message, he asked if anyone had any questions. AMC said that she wanted to know why they were doing Daily Assignments because they were told they would not do that. I said it was only for the summer.

Then Mr. Alfaro said that at the beginning of the tax year he wanted that to continue. Then Alysha asked what the purpose of this was. Then she said she was going to do the same thing daily unless the supervisor gave them another assignment. LH then said it didn't make sense and what was the purpose of them doing this. Mr. Alfaro then said that he did not want to babysit them, but he

14

would revisit this soon.  I didn't say what the purpose of this was because it was to make sure the employees were being truthful as to their pending work.  Right after the meeting, I received a call from my mother. She was sick and asked me to go to her home, and I left for the day.  We did not revisit this subject.

58. On September 20, 2019, DR came to my office to advise me that he had announced that Mr. Alfaro was bringing pulled pork to the office.  He told me this at 11:45 a.m.  I go to lunch at noon. I told DR thank you for telling me, but I have plans for lunch that I cannot break.  I told him I would be able to cancel if I had known earlier, but not now.  At around 12:04 p.m., Mr. Alfaro called me to tell me to send people to the back and for me to go back there to get some lunch.  I usually leave the office at around 11:58 a.m. or 12:00 p.m. sharp.  He knows this. I told him I couldn't because I must meet Tony to give him something, but if I had been advised, I would have canceled, but now I can't.  He asked me if I wanted him to save some for me.  I said no thank you.  He then said to have the employees go one at a time.  I told him I was leaving, but I would tell CA.  He said CA was with him; I told him then I would let DR know.

59. On September 20, 2019, I walked into Mr. Alfaro's Office, and ZS was telling Mr. Alfaro that while he was at a meeting with SA, Doreen Ruggiero had called him, and it was about LG.  She said that she transferred the call to CA.  Since Mr. Alfaro didn't tell her to transfer the calls to me, I asked him why Liliana wasn't back in our office. He said she was still assigned to Family, and they probably called about her.  I told him that I needed to know if she is going to continue to be there when we started the tax year to reassign her assignment to AL.

60. On September 23, 2019, I advised LS to move to OA's old desk so he could work closely with NO. When LS and I went to the desk, we noticed the missing computer tower.  I then asked DT if she saw who and when they took the tower, and she said she didn't see or know when the tower was taken.  I called Mr. Alfaro and asked if he had put in a trackit request to remove the computer. He said he took the computer, and he has it.  I told him I was going to move LS over to that desk and noticed the computer tower was missing.  He said he had it. I found out later that he was having the computer checked for documents that OA may have done since OA was promoted and out of the office.

61. On September 25, 2019, I walked to see Mr. Alfaro at his office about the VAB Attorney, and he was in his office with CA going over the interviews that were held the day before, September 24, 2019.  Again, I am not included in any of the decision-making.

62. On September 26, 2019, I asked Mr. Alfaro if he had inquired about the cashiering issues, we may have due to Code Enforcement officially leaving the County starting on the 1st of October. He said since they haven't told him anything, he will continue like nothing is happening.  I told him I was not particularly eager to wait until the last minute.  I like to fix a problem that may occur, and if it can be resolved, we might as well tackle it before it happens.  He said he will not touch the subject since no one has said anything to him.  I told him no problem.

63. On September 27, 2019, I overheard NO advise someone on the phone that CA was in a meeting. So, I headed to Mr. Alfaro's office, and in his office, both supervisors were meeting up with him. I asked what was going on. And he said that they were going over the interviews.  They had finished the meeting, and he told me to stay, but they had just spent time discussing the people interviewed.  Then he said he had to talk to FG from Code Enforcement.  I said why Frankie? He said that AC didn't want to participate in the interviews. I said OK. I was not called to this meeting; they had decided who would be hired, and I was not included in the decision-making.

15

64. On October 7, 2019, Mr. Alfaro advised me we were getting a new employee (PP) starting today. He said that he wanted to meet with her and both supervisors at the same time. I usually am the one who introduces the employee to the unit, but now he wants to take over and start welcoming the employees to the team, including both supervisors. I told him that I was assigning her to LG's old desk. I also asked him about the two other employees that were hired. I still don't know their names and if they are male or female. At this point, I don't know anything about the two new employees. I asked him about the missing computer that used to belong to OA. He said it was being checked. I didn't inquire as to why or what they were looking for; I just wanted to know whether we were going to get the tower back or if they were going to give us a new computer tower. He said he didn't know. He then asked me what I thought about the temp worker position we had interviewed. I told him the older lady was the most qualified because she spoke Spanish and English and had courtroom experience. He said he was concerned with her since we had bad luck with older people. I told her that we had Angela Cruanyas and she was fine. I told him to do whatever he wanted. I told him this because he didn't like the older lady. Also, my opinion doesn't mean anything, so why waste my time advising him who is more qualified?

> DR informed me that when he went to get Mr. Alfaro's initials on DK's evaluation, he was told that he had gone to a meeting and did not know if he would return to the office. Again, I was not informed that he was attending a meeting, but the employees knew.

65. On October 9, 2019, Mr. Alfaro had the whole unit sing Happy Birthday to IH. I was not included or advised that he would get the entire team to sing. However, IH did notify me that she bought breakfast for the whole unit, and since I always include her in the food, I bought that she wanted to make sure I got some breakfast. I thanked her and wished her a Happy Birthday.

> I asked Mr. Alfaro who he decided to select as our temp worker from the recent interviews. He told me he offered the job to Shakena Bennett instead of Graciela Huete. Graciela Huete had more experience and spoke both languages compared to Shakena Bennett who did not have hearing experience and did not speak Spanish.

> In the afternoon CA told me that they were going to cut a cake for IH for her birthday and do it in the office's back area. She told for me to go back there to participate. I was informed of this when she told me. Mr. Alfaro did not ask me for my input.

66. On October 15, 2019, Mr. Alfaro came to my office and asked if I knew LH was bringing in a Cooked Ham. I told him she left me a note that she brought in a spiral ham and an Italian cake. I told him I didn't go back to the area where his office was, and I didn't see what she brought in. He said she told him that I approved it. I told him I would remember if she asked me to bring a ham. I told him I did speak with her, but I don't remember her telling me anything about a ham. He said that she also asked if she could dress up for Halloween. I told him she didn't ask me about dressing up. He said that we are not allowed to accept anything from any vendors. I told him I don't remember, but maybe I did, but I don't recall a ham. I told him I did speak with her about two weeks ago. He said he had to talk to her about that. He left my office, and I called him back to let him know he would also have to speak to JO, who has been bringing pastries and Cuban coffee for years. It is also my understanding that Mr. Alfaro has accepted coffee from JO. I told him he would also have to say something to those Magistrates who bring in coffee. He said coffee was fine, but she brought a giant ham. I told him I was going to see what was brought in. I went to the back to see the size of the ham. It was a small ham and an Italian cake. I told Mr. Alfaro it was a small ham, maybe worth $20.00, and he said it didn't matter the size or how much it cost they cannot bring in anything.

16

Later today, I saw Mr. RM meeting with Mr. Alfaro, SA, SN, and CA in the back area.  I asked Mr. Alfaro what was happening, and he said it was about the Special Magistrates.  He didn't ask me to stay for the meeting, so I left.

67. On October 16, 2019, I received an email from Yadie Yanelli asking about meeting about the new credit card machine in the afternoon.  Mr. Alfaro responded he was not available in the afternoon.  She then asked if they could meet with me, and he answered that he wanted to be there.

On this same day, a new Special Magistrate came to see me at my office to inquire about setting him up with the ACH deposits.  I then heard IH asking if more Special Magistrates were attending the computer area conference room meeting.  I told her I didn't know.  I went to the back to give the new magistrate a paper he left in my office, and several magistrates were gathered in that room.  I was not informed of this meeting, and I didn't know there would be a meeting, but the employees all knew.

68. On October 17, 2019, someone was at our office door around 8:20 AM.  I opened the door, and it was one of the new Special Magistrates (Sevilla).  He advised me that he was told to ask for SN.  I walked him to the back office when I overheard SN advising him they were scheduled to meet at 9:30 a.m.  Again, I should have been informed of this meeting.

When I was going to turn in the Budgeted Hour Reports for September, I logged into PETS and noticed that there was a new County Commission Clerk 3 position.  I called Mr. Alfaro and asked him why this position was open.  He said he told me that he had my old position of Court Records Supervisor 3 reclassified to that position.  I said he never told me what he was doing.  He said he did.  I told him you told me you were working on something for SA, but I am still waiting to hear what he was doing.  He said yes, I did, and I said maybe you told someone else, but not me.

69. On October 21, 2019, AL came to my office asking for folders because he was organizing the record requests from the warehouse. I asked him why he was doing this.  He said that ZS taught him how to order from the warehouse, and since he needs the files, he might as well call them, too.  I asked him if he had talked to the supervisors because they were changing the tasks from one employee to another.  He said that he and ZS had spoken to Mr. Alfaro in the morning, and he had approved the change.  He said he still didn't have access to order the files online, but that ZS would put in the pending request. I then asked CA to see if Mr. Alfaro had informed her of the changes, and she said she didn't know but that we needed to notify the staff.  I told her we could wait until the monthly staff meeting.

70. On October 24, 2019, I went to talk to Mr. Alfaro, and he was in the backroom coffee area.  When I got there, CA was talking to him. She asked him something about a Special Magistrate who resigned by the name of Francisco Camposano, Jr.  He then made a statement in Spanish. He said, "You no quiero a nadie aqui que tenga malas vibras" He then made a hand gesture like shooing me away, but he kept referring in Spanish. "Si las personas no quieren esta aqui que se vayan." "Yo no quiero a nadie aquí con malas vibras" CA laughed and then I asked him what did Mr. Camposano do?  He then said no, nothing. I know he was referring to me.

Later that day I spoke with the VAB Attorney Mr. RM in the back office, and after speaking with him, I went to talk to Mr. Alfaro.  When I approached his office, I saw him calling someone within our office. He began the conversation by saying, "La carta esta lista." he then realized I was standing at his door, and he kept on looking out of the corner of his eyes and started to speak lower so I wouldn't talk. I stepped a few feet away so he could continue the

17

conversation, but I noticed he was nervous because I heard his discussion about a letter that he was waiting to see if it was finished.

71. On October 29, 2019, I called Mr. Alfaro to ask if he had the hearing clerks on special assignments since no one was in their hearing rooms.  He said what do I mean.  I told him before I called to find out I needed to know if he had them doing something special because all the rooms were empty except for one.  He said that DT, DN, and LH were on his side of the office, but they had finished preparing all the sandwiches for the Breast Cancer event.  He told me to call DR.  I contacted DR and asked him why all the rooms were empty, and he said he was checking boards. I told him I didn't see anyone except for one room with the hearing clerk working.  He said he would find out.

The next thing I see is DR on the 17th floor, heading towards the back area of the office.  I went to the back office, and everyone was back there eating and having a good time.  I went to Mr. Alfaro and told them they were all back here.  He said that when I called, only DN., DT, and LH were up there. He said they were finished a long time ago. He asked me what they were doing.  I told him I didn't know what they were doing, I had no clue what they were doing, and I walked away. Then I saw CA and DR talking, and CA walked out with her lunch bag from the Breast Cancer event.  DR walked behind her and didn't tell me anything. I later realized that they had an event for breast cancer by selling lunch bags. However, I was never informed if I wanted to buy nor that this would occur.

Later that day, I was looking for AL and couldn't find him. Still, as I went to the back office to see Mr. Alfaro, AL was in Mr. Alfaro's office along with DT and DN. He was holding a meeting with them about the Breast Cancer event again, which I was not included.

72. On October 30, 2019, I went to see Mr. Alfaro at his office.  When I got there Mr. Alfaro and CA were discussing confidentiality petitions.  He had DB enter these petitions and was discussing what procedure he had put in place for these types of petitions.  He then asked me to stay, and I noticed that SA was aware of the procedures he was putting in place. Again, I was left out of any of the changes being made in the office, but my subordinates were fully informed.

73. On November 14, 2019, I went to speak with Mr. Alfaro and the VAB Attorney, and I asked SN where they were. SN advised me that Mr. Alfaro and SA were in the conference room on a call. Again, I was not included in the current situation in the office.

74. On December 16, 2019, DR called in sick.  He did not call me but informed CA and Mr. Alfaro that he was not coming.  I overheard Mr. Alfaro and CA discussing it, but neither told me.

75. On January 6, 2020, I saw Mr. Alfaro and SA going into the conference room, I assume, for a telephone conference meeting.  I should have been informed of this meeting.

76. On January 7, 2020, Mr. Alfaro informed me while discussing DB's FMLA package that DB was not in the office because she was in the hospital.  I told him I did not know anything about that. He said that CA told him that she was out today and in the hospital.  I repeated that I was not informed of this situation and was unaware that she was out.  In addition, I am not receiving the daily attendance, and I do not get informed about anything in the office.

77. On January 24, 2020, Mr. Alfaro asked me when I would have our monthly staff meeting, and I told him I wanted DR to be present.  I told him that I could have it on Monday.  He said that was good because AL would start working in our office on January 27, 2020, and we could introduce

18

her to the team. I told him who is she?  He said I told you.  I told him no, and he said it was the new employee.  I told him he told me that we were getting a new employee, but I don't know her name or anything about her.  He said I told you; I told him you did not. He was trying to cover up that he did not inform me of this new employee's hiring.  He told me we would receive the latest computers on February 10, 2020, and he said to ITD that they needed to contact SA, and he had already spoken to SA about it.  He said he would not be in the office and out of town.  I told him that was fine.  Again, he informs my subordinates and does not inform me until the last minute.

78. On January 27, 2020, while we were in the middle of a staff meeting for January 2020, CA stated that she wanted to make all the hearing clerks aware that visitors would attend the hearings.  I asked who was visiting because I was unaware, we would have visitors.  Mr. Alfaro said that the vendor was coming in to observe our hearings. I said I was not aware that we were going to have visitors.  At the end of the meeting, I told Mr. Alfaro, "So we are having visitors," and he said, "Yes." I then told him I was not aware of this.

79. On January 28, 2020, I went to the west side of the office to drop off the invoices I had finished submitting.  I saw that Mr. Alfaro was in his office meeting with SA, the vendor, and the manager from ITD, and he did not advise me to attend.

80. On February 19, 2020, I went to talk to Mr. Alfaro about Special Magistrate Armada and his invoices.  When I got to his office, the VAB attorney and SN said that Mr. Alfaro and SA were at a meeting with the PA's office, and I was not informed or invited to participate in this meeting.

81. On February 21, 2020, I asked Mr. Alfaro when he would be giving me my evaluation.  He said that his part had been ready for about two weeks and was sitting on Mr. Martinez's desk.  He said that he was not the one who was delaying it; his part was done.  He said he would let Mr. Martinez know I asked for my evaluation.

82. On February 28, 2020, I asked Mr. Alfaro again about my evaluation.  He said that Mr. Martinez is still working on it and has much going on.  I told him OK, let me know what he says.

83. On March 9, 2020, I asked Mr. Alfaro about my evaluation, and he said he was waiting for Mr. Martinez.  I told him to please inform him I am asking about my evaluation.  He said he will tell him today when he meets up with him.

Later in the morning, I asked for a meeting with Mr. Ruvin per his request.  In this meeting, I told Mr. Ruvin again about my situation in the VAB. I told him how I was being excluded from all the meetings that were important to the office, and my subordinates were all informed of any changes in procedure while I was being left in the dark. Mr. Ruvin went on to tell me to let him know which positions I was applying for in the County. He said he knew many people and could help me get a job.  I told him he could move me from the VAB wherever he wanted.  I told him it would not look right to recommend me when he can move me from my situation at the VAB. I left this meeting very disappointed since he only wanted to discuss my ex-boyfriend's problems with Mr. Henderson and their power struggle.

84. On March 16, 2020, I asked Mr. Alfaro about my evaluation, and he said he was waiting for Mr. Martinez.  I told him to please inform him I am asking about my evaluation.  He said he will tell him today when he meets up with him.

85. On March 23, 2020, I found out by CA that Mr. Alfaro is not coming in today. He did not call to advise me that he was not coming in and did not let me know if there was anything I needed to know. We are in the beginning of the coronavirus situation and are supposed to alternate the days.

86. On March 30, 2020, I sent several text messages to Mr. Alfaro about the clerk's schedule for tomorrow. Due to COVID-19, there is a skeleton crew, and all the clerks are being rotated. I asked him if he wanted us to go ahead and schedule or if he wished for a conference call. He didn't answer my text, and then he called DR and told him what to do. After my last text, he told me that DR had the information. I told him I was waiting and didn't know, and his response was No Problem.

Later in the day, he told me he wanted me to take two days off, Tuesdays and Thursdays, and he would take Mondays, Wednesdays, and Fridays off. He asked if I wanted to take three days off instead of two. I told him I would call him when I got home since I was driving home when I received his text message. I called him and told him I didn't care what days I took off, but I wanted to know if I stayed home, would it be considered AD or working from home? I told him that I noticed on Wednesday when I left home early because I wasn't feeling well that I was answering emails and approving time from home, and I was given one (1) hour of regular time and seven (7) of AD time. He said I couldn't work from home unless my VPN was up, and I had access to my computer. I told him I would try to see if the MAC computer could access the VPN, and I would let him know. I texted him, advising him that I still could not program my laptop at home and would go in the next day to see if technical services could help me program my computer.

87. On April 1, 2020, I received a call from Mr. Alfaro about SN and his FMLA leave letter. He made me email him from my house a letter without any dates, and I felt he did this to verify I had access to my computer at work. It did not make sense to send him a letter with blank dates.

Later, I received a text from Mr. Alfaro telling me that he wants to take April 10, 2020, from home because he needs to work from home that day. He is taking long weekends and not giving me any long weekends to take when we should be alternating. He is taking Mondays, Wednesdays, and Fridays working from home. I must take Tuesdays and Thursdays working from home.

88. On April 3, 2020, CA advised me that Mr. Alfaro wanted to have a conference call with NO, SA, CA, DB, and me at 2:00 PM. At 2:30, we called him, and he did not answer. I sent him a text message to advise him we were ready for the conference call, and he texted CA advising her for us to call him in ten (10) minutes. He didn't text me but called CA. When he called, he wanted to discuss a pending board that a reconsideration was filed because of an error with the assessed value. He wanted to know if I had paid SM Pedro Alvarez for an uncertain board. I told him I didn't since the board was incomplete. He continued by addressing the reconsiderations being filed for assessed values and wanted NO to email the not-returning magistrates. NO and I had to ask who was not returning to the office because of the coronavirus. He then gave us the names. CA, SA, and DB knew who these Magistrates were, but I was unaware of these SMs. He then said that NO needed to send emails to these magistrates. I told him I emailed Mr. RM several weeks ago that I needed his help getting the magistrates to finish their boards, and he never responded. I had also copied Mr. Alfaro on this email, and no one responded to my email. Mr. Alfaro then said that the Magistrates should not be paid if there were these errors. I felt like if he wanted to address any payments of SM, he should address it directly with me and not with a group of my clerks present. I didn't do anything wrong. However, it was inappropriate for him to address me in front of these employees.

20

89. On May 18, 2020, I talked to Mr. Alfaro about our work schedule and that on May 19, 2020, I would be working from home as we agreed. He told me he had to talk to me about that and for me to come to work on the 19th of May.

90. On May 19, 2020, Mr. Alfaro did not talk to me about working from home. I told him I needed to work from home on Friday, and he agreed. However, he continued to work from home. He told me we needed to be at the office because of the Certification.

91. On May 28, 2020, I worked from home, and Mr. Alfaro has not spoken to me about working from home. He said that he needed to talk to me about working from home.

92. On June 16, 2020, I approved the ePar and noticed that SA was working from home on June 9, 2020; Mr. Alfaro has yet to speak to me about working from home. He has been working from home every Monday, Wednesday, and Friday.

On this same day at 9:41 AM, I asked Mr. Alfaro about my evaluations, and he said that if I hadn't talked to Mr. Martinez about it. I told him I spoke with him about it the day he came over, and he said it would happen by the Wednesday of the following week that we spoke, but I never got the evaluation. He said he would ask him if he talked with him today.

93. On June 17, 2020, I found out when I went to the back office that SA was working from home. DB told me that he was working remotely. I emailed SA and Mr. Alfaro, letting him know he needed to let me know when he was working remotely. I also said it was not a reprimand, but it did not look right for the employees to know he was not there and working from home. SA emailed me back, apologizing and letting me know it won't happen again. He then followed up with a call to apologize. I told them it was not a problem, but he needed to understand that it did not look correct for me to be his supervisor and not know. He said he spoke with Mr. Alfaro last night and had no problem, and he also called CA to let her know. I told him he could text me, but I needed to know.

Mr. Alfaro knew he was not coming in today and did not advise me. Furthermore, he still has yet to speak to me about working from home, yet SA is working from home.

94. On August 25, 2020, I received my evaluations for 2018 and 2019 (Two and a half years later). He asked me to sign off on these evaluations with different dates so he can submit them separately. He said he would submit one today and the other following Monday. After I read both identical evaluations, I noticed that the evaluations reflected only some of what I did in the office. I also questioned why he dropped my Personnel Development rating and asked me to motivate my supervisors who were below me. He then said he needed me to train the employees with the new computer system. He said he needed me to be more involved with the new program.

95. I let him express his thoughts and then told him how I can be involved with the program when I am not included in any of the meetings that have taken place with the new system. He said that he needed me to learn the system well and I should get involved. I asked him how I could get involved if I had been excluded from all the meetings. He told me I was out, and I told him it was not true, but it was just these last weeks. I told him this new system had been in the works for a few years, and I had only been involved in that one training session with Pioneer. I told him that was the only time I was included. I told him that I would be straight with him and tell him how can I motivate my subordinates when I am excluded from meetings and emails or anything that goes on in the office. I told him that the supervisors advise me of anything in the office, and I am not included in his communications. I asked him how he would feel if I told him that Mr.

Martinez told me to talk to him about something he needed to know. He went again to address that he needed me to learn the system. I told him he still hasn't explained the reason for the drop in rating. He said nothing had changed in the last two years, and then I told him my rating should not have changed. I told him I would sign off on the evaluations, but he has not explained why, and it was incorrect for him to rate that way. He also told me he had reasons for addressing things directly with the supervisors, not me.

96. On August 26, 2020, at 8:02 a.m. CA advised me that SA would be working from home today. I thanked her, and a few minutes later, Mr. Alfaro sent an email informing us that Alysha, who is supposed to be working from home, was having trouble signing in and that SA was working from home.

Later in the morning, LG told me that Axia was not working and was waiting to see what she would test on the new system. She said SA had yet to tell her what her assignment would be for the day. She then proceeded to say in Spanish that he was his right hand. I asked if she overheard my conversation with Mr. Alfaro the day before, and she said yes. She heard when I told him I was not included in the meetings and asked how I could know about the new system if I didn't know what was going on with the system. She then told me that ZS was asking why I was not being informed since I was the OIC in the unit. She said everyone could see that I was not included, and it was incorrect that I was bypassed.

LG also addressed that the same two employees are allowed to work from home, and there should be a rotation or schedule to be fair with everyone. Everyone is noticing it's always the same people working from home.

I asked to see Mr. Martinez about my evaluations.

97. On August 28, 2020, Mr. Alfaro did not call me to let me know if there was anything I    needed to do. However, he did speak with all three supervisors.

I met up with Mr. Martinez later in the afternoon about my evaluations. I told him that Mr. Alfaro told me I had to start training the employees on the new computer system and that I needed to get more involved. I told him that I asked Mr. Alfaro how I could teach anyone on the new system when I had been excluded from all the meetings that had taken place. I told him that the only one who was fully informed of the system was SA because he was included in every meeting that was set for the new computer system. I also said that my evaluations did not reflect any of the duties that I performed. That he lowered my rating under interpersonal skills. I asked him how I could improve my relationship with the employees when he was always talking badly about me to the employees. He also stated that I needed to motivate my supervisors so they, in turn, motivate their employees. I told Mr. Martinez that he had initially divided the office and turned them against me. Mr. Martinez told me that it was incorrect for him to ask me to train employees on the new system when I have not been involved in any of the meetings with the company. Mr. Martinez was very quiet and listened to everything I told him. I asked him if I could be transferred to another unit in this meeting. He asked me if I wanted to stop working in the VAB. He told me to take my time, think about it, and let him know when a position was opening in his division. He said he wanted to avoid transferring straight out of the VAB because it would look like I did something wrong. He said he wanted me to get a promotion out of the VAB. I told him whatever he wanted to do and would let him know where I wanted to be transferred. I also told him I would like to return to the Civil Division if possible, and he said he had no openings now. He told me to

contact him and let him know what I wanted to do. In the meantime, he would talk to Mr. Alfaro about his behavior and what we discussed about my evaluations.

98. On August 31, 2020, Mr. Alfaro did not call me to let me know if there was anything I needed to do.  However, he did speak with all three supervisors.  Also, SA attended a meeting at 11:00 am.

99. On September 9, 2020- I sent a text message to Mr. Martinez showing I wanted to be transferred out of the VAB due to Mr. Alfaro's behavior.  I told him about a position that was going to open soon. I also informed him in this text that Mr. Gonzalez and I had broken up and were both very private about our relationship.

100.   On October 7, 2020- I texted Mr. Martinez to ask if he had talked to Mr. Ruvin about my situation.

101.   On November 6, 2020, Mr. Alfaro called for the attendance and asked me if I included Ashley in the number. I asked him Ashley, who?  He said Ashley Font.  I told him I didn't know she was assigned to us.  He said she was, in fact, for a few months now.  I told him I didn't know anything about this.  He said he thought he had told me.  I told him I didn't know anything about Ashley.

102.   On December 2, 2020, I texted Mr. Martinez, letting him know of a position opening in his area.

103.   On December 3, 2020, I received a text message from Mr. Martinez thanking me for reminding him of an open position in his area. After reading this response, I knew he would not move me or help me get out of the VAB. I decided to ask my sister to help me get out of the office.

104.   On August 30, 2021, NO accepted a job with MDPD. We received an email from COC HR Manager asking when the office could release NO from our office.  Mr. Alfaro said he wanted two weeks to release her.  He was upset that NO was leaving the VAB, and he was also upset that she did not give two weeks' notice. I advised him via text message that it was not NO asking for her release date. It was MDPD.  He later told NO that COC HR had decided for her release date.

105.   On September 1, 2021, NO wrote a complaint against Mr. Alfaro. She addressed her complaint to Mark Martinez, and Mr. Martinez responded to her complaint.

106.   After NO wrote her complaint, Mr. Alfaro researched NO's personnel file and tried to find her tardiness issues. He said COC HR would like copies of all the notes on NO to reflect her bad behavior.  I emailed Mr. Alfaro all my notes on NO. He asked for my notes on her being tardy. I told her out of the whole group that was spoken to, she was the only one who improved her arrival to work, and there was no need for a follow-up with her.

107.   On September 21, 2021, Mr. Alfaro wrote down on his weekly meeting notes to ask Mark Martinez for interviews for the OIC position, which is my job title. Mr. Alfaro was on only one interview panel for an OIC position on March 17, 2022, after I had retired from my former position.  Mr. Alfaro was trying to remove me from my job.

108.    Late September 2021, an employee informed me that Mr. Alfaro was telling all the employees that I wrote the complaint submitted by former VAB Employee NO. This employee also informs me that he is trying to have me replaced.

109.    On October 6, 2021, Mr. Alfaro asked me to visit his office.  When I arrived, he told me we needed to put three people in different building locations since the VAB Meeting was moved from the 6th Floor, Room D, to the Commission Chambers on the 2nd floor.  He said we needed these employees to inform the Agents of the change of location. I told him I would find three employees and have them wait for anyone attending the meeting to direct them to the 2nd floor.  I called SN, AL, and DK to my office and assigned each to a location.  AL was going to the 6th Floor, SN, to the escalators' front.  DK would be at the information area where guests check in to get their identification stickers.  I went with DK to the first floor and spoke with the Supervisor of the security crew on the 1st floor and advised him of what DK would be doing in this area.  I returned to report to Mr. Alfaro as to the assignments so he can be sure we were covered.  He then told me he wanted SN in the information area because he knew the agents better than DK.  I said to him that DK works as a hearing clerk and is very familiar with them, but it was no problem if that's what he wanted.  I went to tell SN and DK, and SN had already told DK of the change.  In other words, SN had advised Mr. Alfaro on the assignment, and Mr. Alfaro had changed the duties without talking to me first and advised the employees.  He continues to undermine my authority.

110.     On October 13, 2021, Mr. Alfaro had a team interview session with the temp workers who were being interviewed.  I was kept behind the scenes during this interview session and did not participate.  At the end of the interviews, he asked me to set up the packages for the CC2 positions interviewed for on October 14, 2021.  I asked him to forward the questions, and he said he had to get the questions approved by Mr. Martinez.  I waited until 4:30 p.m. I am still waiting to receive any questions from Mr. Alfaro.

111.    On October 14, 2021, I asked Mr. Alfaro for the questions for the interviews to finish the packages for the supervisors.  He said he was still working on the questions. I was going to take the packages I had halfway completed, and he told me not to leave them on his chair but to give them to DR to complete.  I told him I would give it to him. When I gave the packages to DR, he told me he didn't want to hear that he was behind in scheduling. He said he was in interviews yesterday and today, a four-day week.  He said he didn't want to have to tell Mr. Alfaro why he was falling behind on scheduling.  I told him to take notes every time I was instructed to talk to him about falling behind. In addition, Mr. Alfaro has not let me participate in any of the interviews for the office, as all the other OIC's in other units conduct the interviews.  His previous OIC would be responsible for all the interviews.

112.    On November 5, 2021, Employee Union contacts COC HR via email to address ZS's complaint against Mr. Alfaro. She complained that he kept harassing her to file a complaint against me.

113.    On November 16, 2021, ZS asked me to approve a leave request and I asked her if she was scheduled for boards, and she said she shouldn't be.

114.    On November 19, 2021, CA sent me the list of changes for the hearing clerks for the following week.  I noticed she had scheduled DB and ZS to go to the 6th Floor to cover hearings and the reception area.  I told CA that ZS had told me that when I was approving her time and asked her if she was scheduled for hearings, she shouldn't be scheduled.  I asked CA whether ZS can be

scheduled because she made that statement. She said she didn't know either. I told her maybe they had a conversation we may not be aware of. We decided to call Mr. Alfaro since he was working from home. I told him the situation that ZS had mentioned she should not be scheduled for hearings, and I wanted to make sure if she was going to be scheduled or not. I also told him that I knew about DB's medical condition, but she was currently scheduled because we were short staffed. He said he was coming into the office on Monday but did not want DB in a board. I told him we didn't have any other employee to cover the hearing. He said he would take care of it on Monday and would talk to ZS.

115. On November 22, 2021, CA came to tell me that Mr. Alfaro was aggressive on the phone with her when she asked him about DB and ZS covering the hearings. She said that he told her he never said he would talk to ZS and never said anything. She said that she was either going crazy or he was going crazy because she knew that we had the conversation that Friday. She was in front of me when we were discussing the situation. She said he was very aggressive with her. She said she was leaving the calendar as it was and wouldn't worry anymore because he does not address anything with us, and we don't know what is happening. I told her I would talk to him later. When I went to his office, we discussed some other issues, and then I asked him about scheduling the hearing for November 23, 2021. I told him that there was some confusion. I noticed he did not want to talk to me about the situation.

I felt as though he was hiding something. He said there was miscommunication. He said it in an angry tone. I asked miscommunication with whom? He said with people, and I asked him if there is something I needed to know, and he replied that I would find out when everyone else would find out. I said OK, no problem. I found this to be disrespectful since I am his assistant. I also noticed he didn't want to discuss the situation because ZS was at her desk and didn't want her to hear a discussion. He has yet to address this situation with me.

Ms. Soto contacted the Fair Employment Office about Mr. Alfaro on the same day.

116. On November 29, 2021, I called Mr. Alfaro because CA had advised me, we were short-staffed, and we still didn't know what to do with DB and ZS, and they were the only ones she had to cover the hearings, and she didn't want to send them to hearings. She was asking for my approval. I told her I did not know anything yet, but we would call Mr. Alfaro on the phone since he was working from home again. I put him on speaker phone and told him about the situation in the office, and he said if we didn't have anyone else, they both needed to cover the hearings.

ZS asked to speak with me on this same day. She came to my office and told me that she heard someone said that she made a comment, and they said I was the one who said it. She said it was about her covering the hearings. I told her the only comments I had made about her was to Mr. Alfaro, and it was a concern that both CA and I had about her covering hearings because of the statement she had made to me the day she requested time off. I told her she told me when I asked her that day if she was scheduled for a hearing, and she told me she shouldn't be. I told her I had a concern and asked Mr. Alfaro because we did not know if we were allowed to have her go to hearings or since both CA and I are never informed of conversations Mr. Alfaro has with the employees, and the information never gets passed down to us. I told her that was the only time I commented on her, and it was to Mr. Alfaro. She said it became a big to do. I told her she was right because he was rude to CA and me when we addressed the situation. She said she came to me because she wanted to hear my story. I told her I didn't understand. She said that Mr. Alfaro was blaming me for sending her to hearings. She said that he was blaming me. I told her that I was trying to make sure we had coverage, and we were not sending her to hearings if she shouldn't be attending. I told her

25

about the situation today and our staff shortage. I told her we called him, and he said to send her to hearings. She said he kept blaming me for everything and that what I just told her was not what he said. He told her I had told him she was refusing to go to hearings. I told her that I no time we said such a thing. I told her that the only thing we addressed was whether there was something we needed to know to send her or not. She said he lied to her, and now she knows he is lying to her. I told her I didn't want to know what he said to her because I could only imagine what he had said about me. She said it was bad and that I didn't want to know because it was bad. I told her that I don't know when he has conversations with employees; in fact he never informs me of anything. She said that everyone knows that. She said what is happening in this office is not correct, and she doesn't understand why no one in upper management has stepped in to see what is happening in this office. She said the office is like you are with him or me. I told her I didn't have anyone on my side because he is always trying to put the staff against me. She said he is still doing that. I told her I know. I also told her I had stepped back and let him run his office as he wanted. She told me she wanted to leave and was desperate to leave because she did not like what was happening. She also told me that she knows I have the employee's back, unlike him, who does not. I thanked her for coming to me and clearing this matter with me. I told her that the best way to address these problems is direct. She told me she overheard my conversation with him, and he did not want to address the situation with me because she was at her desk. She said she knew I was not lying to her and that he was behind the decisions. I told her that he is because I have taken a step back and let him make every decision, so he is the one to be responsible for the decision. I told her every time I decided, he would go back and change whatever decision I made, and since that happens all the time, I decided to let him make all the decisions even when he is not in the office. She said that is not correct. I told her I know, but this is our office, and we must adapt. She kept saying she wanted to leave this office. I told her she needed to do what is best for her and her family. She said she was going to file a complaint. She also said she was talking to the union already. I told her I could not tell her what to do, but she needed to do what she felt was right for her. She thanked me for our conversation.

117.  On December 20, 2021, before I left on my vacation, I spoke to Mr. Martinez about retiring on December 31, 2021, because of my situation with Mr. Alfaro and how they (the executive office and him) did nothing to help me get out of the office. I told him I was working in a hostile environment, and they were fully aware of the situation in the VAB. I told Mr. Martinez they did nothing to help me get out of this environment, and they (Ruvin, Henderson, Candame, Saboya, and Martinez) left me there on purpose. They were fully aware of the situation in that office. I told him I was on vacation starting Wednesday but wanted to start this same day. He tried to convince me not to retire and was willing at that moment to transfer me. At that moment, I was unaware of the situation with Ms. Soto and Mr. Alfaro, but Mr. Martinez knew and was willing to move me right then and there. He offered to send me to the Record Center. I told him it was too late that when I asked for several years to be transferred, he did not want to move me, and now it's too late.

118.  On December 21, 2021, I called ZS because I had left an item on my desk, and since she arrived early, I asked her to bring me the item I forgot to the first-floor lobby. While I was talking to her on the phone, she began to tell me everything that Mr. Alfaro had said about me and everything he did against me. Ms. Soto was Mr. Alfaro's secretary; she would hear everything he said about me in the office. She told me that Mr. Alfaro was pushing her to file a complaint against me with the Fair Employment Office for Harassment. He had said to her that he had filed a complaint against me with the Fair Employment Office. This was all a lie. He never filed anything against me, which would not make sense since he was my supervisor.

26

119.    After I retired, I started submitting public records requests for specific documents.   In the papers I received, I discovered many things kept from me while I worked at the VAB.

August 17, 2019


Mr. Mark Martinez
Senior Deputy
175 NW 1st Street
Miami, Fl. 33128


Re: Hostile environment at the Value Adjustment Board.


Dear Mr. Martinez,

I am writing this letter with mixed emotions to bring your attention to the inappropriate behavior I have witnessed at the VAB for the past two years and four months. This letter was not easy to write especially since I thought I would never have to write it. But I thought of our Senior Deputy and how clueless he must be about this. I thought of your kind words when I answer the phone. You have been such an admirable person since your days at the Family Division. You are a true leader who deserves to continue to have a stellar career with the Clerk of Courts. Therefore, I decided to make you aware of my truth. You need to know what I have been subjected to and what truly goes on behind closed doors. I count on your discretion with this matter since I do not wish to be exposed or confronted to the individuals mentioned herein. I am afraid of retaliation against my integrity and my new position at the County Recorder's office.

I must go back to the beginning for you to get a better picture but I'll be as brief as possible. I started working at the VAB as a hearing clerk around Dec 2016. As usual, I performed to the best of my ability and in less than six months management decided to have Nydia Orta train me to read the Magistrates' finding of facts sheets (big jump.) In October 2017 I am asked to train with Angela Cruanyas who was about to retire. This meant a promotion to Lead Worker position and a new assignment. After Angie retired, I was asked to move to the back side of the office. I was later told I had to interview for Angie's position but thankfully I got it.

I was looking forward to getting to know Mr. Alfaro. I worked with his sister Rosa many years ago at the PVB and through her I met Wendy, the other sister, and Rosa's husband Frankie. So I was really excited to be closer to the boss. With Angie's position, I also inherited coffee duties which I took over gladly. My transition to Lead Worker was not easy. I faced a lot of cold stares and silent treatment from my peers. — Why do you bilieue? My supervisor, Celia Arevalo, was cordial and supportive. Understanding her English was a challenge at times but I got used to it with time. Regardless of her language barrier, I always showed Celia respect, followed her instructions, and always copied her on every single one of my emails.

The next day after I moved to the back, I heard Mr. Alfaro come in. Coffee is ready for him. He went desk by desk and addressed his male employees in the back as "bro" or "what's up baby?" I was kind of in awe. As the days went by, I knew I had joined a fraternity and not the boss's office. It was the sports talk, the laughter, the slangs, etc.

? more specific

**EXHIBIT C**

*Why/only certain people ?*

There was also the ball rolling at the end of the day where Mr. Alfaro would roll a ball from one end to the office to one of his *Frat fellows* at the other end (by the door) and he had to catch it to avoid a "goal." Mr. Alfaro felt comfortable around me to show his true self. Members of the fraternity are Scott Austin, Santiago Narciandi, Anthony Lavadie, and Dion King.

He also has his favorite female employees as well: Diana Narcisse, Tawanda Coleman, and of course, Laceila "Cece" Henton. Mr. Alfaro always made special remarks about what they were wearing and occasionally asked them, "Who is your Daddy? The first time I heard him say it made me so uncomfortable *Did you say anything ?* because I felt it was unprofessional. After that I got used to it. The girls often brought him lunch or called him to order with them. Diana Narcisse was particularly close to him. She always called for him while I was attending his phone during his secretary's lunch hour. On one occasion I walked into Mr. Alfaro's office to leave a note thinking he wasn't there. But he was sitting down with Diana standing very close to him. I felt like I had walked into something but will not speculate or pass judgment. I said I was sorry and walked out. *Did you see any ? Report in a report* Mr. Alfaro called me back and said, "Yes Monica."

There were times Mr. Alfaro and his aforementioned fraternity would disappear from the office. Until one day I was passing by the conference room and heard laughter coming from there. Cannot speculate as to what they were doing but they sure were having fun. Just like I also noticed Scott Austin go inside the back room next to ours which was always locked and off limits for the rest of the employees. However, he had the key. I must say though that both the gatherings in the conference and Scott's use of the room eventually stopped.

The breakfast club was nice at first. I participated from the very beginning and went out of my way to get bagels for the office every time I was asked to do it. Mr. Alfaro even cooked eggs at some point. However, when we began to order out, it was rather uncomfortable because we took orders and the question was always; do you want sausage or bacon? Mr. Alfaro played around especially with Dion King saying "I know you want sausage." I was really uncomfortable while I remained there waiting for an answer. Thankfully, *Did you ever tell anyone ?* Dion NEVER replied to this vulgarity in my presence. He would just laugh it off. I want to believe he did it out of respect for me as a woman.

Laceila Henton was not a part of the breakfast club but ate from our paid food whenever she wanted to. She would walk around the office without a care in the world even if she had hearings that she left unattended. In one despicable occasion, I witnessed how Mr. Alfaro approached her to greet her. She leaned over to receive the kiss. He carefully wet his lips and planted a kiss on Cece's cheek. I was standing right behind them. He didn't seem to mind that I was right there. This was truly disgusting. Now my blindfold has come off. My boss is not the person I thought he was. What do I do? Do I mention *Why didn't you ? Fear ?* something? I cowardly grabbed by food and back to my cubicle. It bothered me that Cece was called to eat but not our Officer In Charge, Rosemarie Estevez. She ALWAYS brought us doughnuts or ordered pizza and wings for the entire office. She made for us her famous cheese dip. Raffled gift cards every 3 months as an incentive to make us receive perfect attendance. This came out of her pocket. She even offered to buy us a toaster while Mr. Alfaro collected $2.00 from each one of us to buy it. I would offer her food but she always said no.

Around Nov 2018 I decorated my side of the office for Thanksgiving with my own money. I wanted it to look good and boost the morale. Everyone seemed to be happy with the decorations. However, Rosemarie joked with me and said I had to do the whole office.

On Friday of that same week, Celia Arevalo approached me while we were having breakfast. She got close to me and said; "Listen, don't let Rosemarie intimidate you. This is all about control. She feels jealous of Mr. Alfaro and his relationship with his employees." "Because of this, I don't go to her for anything, only to him." My jaw dropped and in my mind I thought if this woman has the heart to talk about her boss like this, imagine what she could do to me. Ironically, I did find that out later on.

One day I received an email from a P.A. Supervisor, Jason Dicroce, regarding wrong procedures for condensed boards. I brought it to Rosemarie's attention since Celia wasn't around. When I came back from lunch, Rosemarie calls me in the office. I found Celia sitting there because they wanted to discuss the email. At this time is when my fate changed. Celia had stated she had in many occasions set up an earlier afternoon board for one of the agents (Beck.) I called her out saying that had not happened since I was the one who scheduled Magistrates and I would have known if someone came earlier. I spoke up because Celia was lying to Rosemarie. This turned out to be the biggest **mistake** I ever made. Celia was no longer the person she'd been after this meeting.

Around this same time, my personal life was affected when I received the shocking news that my mom was diagnosed with advanced Alzheimer's disease. My world crumbled down entirely; my entire life with my mom flashed in front of my eyes. I knew this disease would change my life and my family's forever. My world was now filled with anguish, fear, anger, confusion and sadness. I thought of coming to Celia to disclose this personal tragedy. But Celia was distant, would still come to our side for coffee but would no longer engaged in talks with me. She would only go to Zoraida Soto or her "son" Scott to talk until Mr. Alfaro arrived. She had breakfast with him on a daily basis and stayed in his office for a while.

Unfortunately I did make two errors in scheduling. I brought them to Celia's attention head on. She was cold, told me to correct the mistakes and turned the other way. I expected concern, empathy, worry for someone who had given so much for that office. I didn't get it ☹.

From that day on, Celia began to micromanage every detail of my work; questioned me on every email (always copied her on all my emails.) She was no longer available like before. I would call her on the phone but she wouldn't answer. I had to walk to her office for help. Now I am feeling worse than ever, reluctant to confide in her with my personal issues. I began to have self-doubts, every time she called me on the phone, my heart sank. If I talked back to her, she called me defensive. When she blamed me about other people's mistakes, she would call me sensitive. I went from the start performer to the worst employee that ever existed in the history of the VAB. She made me feel incompetent because she questioned everything I did. This was her time as a supervisor to counsel me, to show concern for an employee who was showing signs of distress; to care for someone who had shown her so much respect and never made fun of her poor English skills. In spite of all of this, I continued to do my work and managed to remain professional as always. My magistrates and my work can definitely back this up.

I tried reaching out to Mr. Alfaro for a second time. He was no longer as friendly as he used to be but he was still my boss and I had faith in him that he would listen to me and sympathize with my personal tragedy considering his wife's parents also suffer from Alzheimer's. He stopped saying good morning to me like

*When was this . . .*

before. He would call every one by name except me. Regardless, I approached him as he was leaving the office and asked him if I could please speak to him in private. He said he cared a lot about his employees and that he would call me. HE NEVER DID.

My evaluation came sometime in January 2019. I wanted to smooth the edges with Celia and also confide in her with my problems. I did not want animosity so I was willing to try once again. Celia sat with me and gave me the evaluation. She said read it and let me know if you had any questions. She was again cold and very matter of fact. I barely read it. I felt sad because it was not going as to what I had hoped. However, I did say that I felt uncomfortable with the name calling "sensitive" "defensive" she used in the past with me. I also told her that I respected her and that I felt the distance between us. Celia replied, "it's all on how you perceive things." Now I wondered how this person got to that position when she's not equipped with the right tools to handle an employee who is telling her you are treating me wrong and I don't appreciate it. I just signed the thing and hurried out of there.

Days later, Rosemarie called me in her office one day. I walked in to find Celia sitting there and with a smirk on her face. I knew right there what this would be about. Rosemarie showed concern and asked what was wrong. For the first time I felt someone cared. But opted to not disclose my personal issues because of how Celia was treating me. Instead, I came up with another excuse and blamed the decorating which had kept me too distracted. I thanked Rosemarie for caring and offered to pay close attention.

As a desperate measure, I encountered Scott in the terrace at lunch time. Felt so trapped that I decided to confide in him and the situation with Celia. He disclosed pretty personal information about Celia and her "errors." He said she ALWAYS messed up and he had to correct her mistakes. Scott suggested that I have a meeting with Mr. Alfaro (I had already tried but didn't say anything) about the issue with Celia and also with the property appraiser which had started it all. After leaving the terrace, I realized why Celia was so attentive to Scott serving him and Mr. Alfaro coffee and crackers almost every afternoon. Now I knew Celia was not Ms. Perfect. Her mistakes did not come to light because they were kept quiet. And her greatest gift, she was supported and empowered by the boss himself, Mr. Alfaro.

I also reached out to Evenor Castillo. He had started working at the VAB around 2 weeks before me. I got along with him so well so I felt comfortable enough to ask him how our coworkers treated him. I was so relieved when I heard him say they ignored him too and that there were days he said good morning and no one replied. Just like me. Evenor also told me talk to Oni (Onidia Acosta) she's going through the same thing. Now I knew our peers gave us the hard workers the cold shoulder because we worked. And all three of us were removed from hearings to stay upstairs. They were lucky because they did not have Celia as supervisor. Eventually, I confided in Rosemarie about my mom situation. She listened to me and advised that I filled out a family leave package. Rosemarie made me feel better.

The last **insult** happened when I overheard Celia tell Mr. Alfaro about our meeting with Rosemarie. Celia said; "decorations should not be allowed in the office because it causes employees to mess up." He laughed. She laughed. I had heard them before talk about the OIC in their long talks but this time it was about me and I was right there. I am sitting in my cubicle listening to this in horror. I am sure everyone else heard it too. I wanted to get up and leave. Felt humiliated, wanted to cry, wanted to go in that office and ask them why. Why are you guys talking about me without a care about my feelings? Mr. Alfaro was no longer the person I wanted to look up to. He failed me just as Celia did.

*You believe they were talking about you? Did you ask?*

Came Celia's birthday and everyone is gathered in her office with a cake. I walked in there too not because I was directly called but just to be team player. The only one missing was Rosemarie. I asked where she was. It turned out nobody called her to join us. And this happened right there in the office next to hers. I am like what is wrong with this people. I went to tell her and she had this sad look upon her face and said she was on the phone but no one came to tell her what was going to happen.

Mr. Alfaro's 30 year anniversary was next. Scott had the idea of buying him a plaque and asked me to contribute $10. I went through all the emotions of the past months and you would think no way but I did contribute. He was presented with the plaque in front of his employees and superiors. He was honored for all the "hard" work and for certifying two times in a row. I was happy for him because it's an accomplishment after all. However, at the time of his speech, Mr. Alfaro thanked the team and also his right hand: Mr. Millares. How unfair can life be! Now I am completely shocked because the true force behind the timely certifications was Rosemarie Estevez. She would go by every one's desk and ask if they were ok and if they had anything pending. She is very big on pending because if you have any she will find you help. Then I understood Rosemarie Estevez was alienated and unappreciated, just like I was. She just wouldn't divulge something this personal to me. I was not alone.

Rosemarie called me in her office to tell me I had been assigned to the Recorder's office to answer the phones there for the summer. I wanted to get out of there so badly that it didn't matter where they sent me. However, I knew things would not be the same upon my return. Celia would displace me from my position and even perhaps demote me. I had seen all the influence she has over Mr. Alfaro. This time one of the frat boys will take my position and I bet without having to interview for it. Or even one of his favorite ladies might get lucky. I shed some tears while I was cleaning my desk because I cared about my job and enjoyed what I did. My relationship with my Magistrates was awesome. My relationship with the PA was also wonderful and professional. I put all my belongings in a box waiting for the worst.

Luckily the opportunity came to apply for the secretary position and was chosen to do it. They say people don't quit jobs, they quit Managers. That's what happened to me. Mr. Alfaro did not even call me to wish me well. I didn't expect it from Celia. These days I feel stronger, relieved, and optimistic about my contribution to the Clerk's office and my new job. I am happy again.

Thanks in advance for reading my truth and for your discretion. Sorry for this inconvenience.

May God Bless you!


Monica E De La Cruz